In the United States District Court for the Northern District of Texas

Dallas Division

| | | |
|---|---|---|
| Sonya L. Chapman | § | |
|     Plaintiff | § | |
| V. | § | No. 3:23-cv-00799-K-BN |
| | § | **Jury Demand** |
| ADT LLC et seq | § | |
|     Defendant | § | |
| | § | |

**Plaintiffs Supplemental Statement of Claim in Response to the Courts Findings, Conclusions, and Recommendation**

**TO THE HONORABLE JUDGE OF SAID COURT:**

    Plaintiff Sonya L. Chapman, now comes to file her Restatement of Claim for unlawful employment practices in violation of 42 U.S.C. 2000e et seq, 42 U.S.C. 1981, 10th Amendment Bill of Rights, 14th Amendment Due Process, in response to the Courts Findings, Conclusions, and Recommendation. 28 U.S.C Sec. 770 Trial by Jury (Trial of Issues of Fact)

**Discovery Plan**

1. Plaintiff intends to conduct discovery in this matter under Level 1, 2, and 3 of the Texas Rules of Civil Procedure.

**Parties**

2. Plaintiff Sonya L. Chapman is a citizen and resident of the United States, residing in Dallas County, Texas.

3. Defendant is a limited liability company organized under the laws of the state of Delaware with its principal place of business located at 1501 Yamato Rd. Boca Raton, Fl 33431.

**Plaintiffs Supplemental Statement of Claim in Response to the Courts Findings, Conclusions, and Recommendation**

## Jurisdiction and Venue

4. Jurisdiction is invoked pursuant to 28 U.S.C. Sec. 1343 (a)(4) and 28 U.S.C. Sec. 1331.

5. This is an action at law and equity to redress violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 1981, declaratory and injunctive relief pursuant to 28 U.S.C. Sec. 2201 and 2202.

6. Venue is proper under 28 U.S.C. Sec. 1391(b), at all relevant times the activities giving rise to this action took place in Dallas, County, Texas in which this court has jurisdiction.

### A. Background

#### 1. Duty to Prevent

7. ADT LLC ("Defendants") have a duty to prevent discriminatory actions to Plaintiff.

8. Plaintiff and "Defendants" had an employer- employee relationship.

9. "Defendants" failed to prevent harm to Plaintiff from discrimination and harassment for opposing discriminatory actions committed by "Defendants".

10. "Defendants" breached that duty by failing to prevent discrimination and harassment to Plaintiff.

11. "Defendants" directly and or indirectly caused harm to Plaintiff by discharging her because she opposed their discriminatory treatment.

12. "Defendants" actions wholly and or in part affected the terms, conditions, and privileges of Plaintiffs employment.

13. At all times complained of in this complaint, Plaintiff had a right to be treated by "Defendants" the same as similarly situated white employees.

14. "Defendants" knew or should have known the actions described herein were wrongful, and seen as discriminative and retaliatory.

15. "Defendants" knew or should have known the law regarding preventing discriminatory and retaliatory acts.

16. "Defendants" failed to train, and or supervise their supervisors, managers, human resource agents in order to prevent the actions described herein, and complained of by Plaintiff.

17. "Defendants" failed to supervise the managers, training team, and supervisors complained of in this complaint to prevent harassment in their workplace.

18. "Defendants" are required to have posted and follow the laws regarding discrimination.

19. "Defendants" breach and or failure to prevent harm to Plaintiff because of her race is the direct and or proximate cause of Plaintiffs injuries.

20. Plaintiff did not have the option to make a written complaint, because "Defendants' did not have a policy for written complaints.

21. Plaintiff asked "Defendants" Ashley Merrick on March 7, 2022, if there was an appeal process for her discharge from employment, and "Defendants" denied having an appeals process for terminations.

### 2. **Damages/Intentional Harm**

22. Plaintiff was harmed by her loss of employment.

23. Loss of employment caused emotional distress, loss if income, loss of consortium, and loss of enjoyment of life.

24. Plaintiff during her tenure managed to refrain from her nicotine use, and the day of her termination started using nicotine again from the stress of her discharge.

25. Plaintiff started using nicotine again due to the stress of diligently working for the promotion "Defendants" maliciously, wrongfully took from her.

26. "Defendants" acted with intent to harm Plaintiff in terminating her employment, causing emotional distress.

27. Plaintiff's emotional distress is continuous and ongoing.

28. Plaintiff was intentionally targeted by Defendants to commit their acts of discrimination and prejudicial treatment.

29. "Defendants" are responsible for hiring the supervisors, managers, and Human Resource agents who acted with malice and intent to deprive Plaintiff of due process.

30. "Defendants" made a false inference that Plaintiff stole time in their disciplinary action terminating Plaintiffs employment.

31. Plaintiff professional reputation was harmed with their statement Plaintiff would not begin work while on the clock.

32. "Defendants" false statement that Plaintiff would not begin work on time insinuates Plaintiff was stealing time and is defamatory.

3

**Plaintiffs Supplemental Statement of Claim in Response to the Courts Findings, Conclusions, and Recommendation**

33. "Defendants" comments made using their written corrective action is false causing libel and slander.

34. "Defendants" reason for terminating Plaintiff (unable to perform duties) is shady, questionable, and suspicious.

35. Plaintiff was terminated for opposing "Defendants" treatment.

36. "Defendants" retaliated against Plaintiff for opposing their treatment.

37. "Defendants" intentionally, maliciously oppressed Plaintiff as their actions complained of herein are foreseeable oppressive and intentional.

38. Plaintiff harm caused is due to "Defendants" actual malice and intent to harm Plaintiff.

39. It is "Defendants" fault Plaintiff suffered collaborative simultaneous injury at all times as described herein.

40. "Defendants" negligence either collaboratively or independently is the proximate cause of Plaintiffs injuries.

41. "Defendants" were hostile towards Plaintiff by conspiring to deprive her of her promotion in making false disciplinary statements, thus damaging her performance review.

42. There were multiple "Defendants" that took part in the making of false performance issues, namely Sam McLaughlin, Ashley Merrick, Kayla Schultz, and Ashley Rioux, Phil, and Latoya Lugan.

43. The team of "Defendants" conspired together to deprive Plaintiff of her promotion, and her employment.

44. Plaintiff claimed damages in her Offer of Settlement dated April 27,2023 to "Defendants" for an actual amount of $35,000 for pain and suffering, the approximated damages for one (1) year of wages at $16.70 per hour for 40- hour work week in the amount of $34,736, and an amount of $16, 610 for 3 years of vehicle maintenance to include repairs, fuel, and depreciation totaling $86,346.00.

45. This amount of damages does not exceed the maximum limits of the Tex. R. Civ. P. 47(c)(1-4) Claims for Relief.

   ### 3. Plaintiff's Employment

46. Plaintiff began her employment with "Defendants" January 2021.

47. "Defendants" promoted Plaintiff in January 2022 because of her good performance evaluations. (Please see exhibits 3 and 4).

4

48. Plaintiff received compliments and positive appraisals from team members. (See Docket No.5 ID 28, Case No. Case 3:22-cv-02188-D-BN)

49. Plaintiff had positive reviews from fellow co-workers and no complaints about her performance from management.

50. "Defendants" did not give Plaintiff negative performance reviews prior to her opposing discriminatory actions approximately early February, through early March 2022 when the negative performance reviews started.

51. Plaintiff continued to perform satisfactorily, and remained employed even though "Defendants" continued to write negative performance reviews early February, through early March 2022.

## B. Statement of Material Facts

### 4. Pretext and or Mixed Motive

52. Plaintiff contends she has the necessary skill and experience for the Regional Support Specialist role as she is a college graduate with more than 10 years in customer service including phone and in person customer service skills. Plaintiff contends she worked for Defendants ADT LLC in the Field Operations Support Center (FOSC) as a scheduler for (12) twelve months prior to accepting the role of Regional Support Specialist.

53. Plaintiff contends she scheduled technicians for jobs in her scheduling role performing the same tasks as the *Regional Support Specialist'* such as using the technicians schedule to find available appointments according to the skill level of technicians available, networking with *Regional Support Specialist'* to find sooner appointments, and to move appointments, when possible, to schedule sooner service appointments for missed appointments and or sooner appointment time requests.

54. Plaintiff in her scheduling position took initiative to learn some of the duties of the *Regional Support Specialist* role to better facilitate her role as a scheduler as some appointments would be overbooked, under-booked meaning not scheduled at all and was a main complaint of customers.

55. Plaintiff contends by networking with the *Regional Support Specialists* prior to applying for the *Regional Support Specialist* role she was able to learn and practice some of the tasks of the role prior to on-the job training.

56. Plaintiff contends that it was imperative that she learn how to perform some of the *Regional Support Specialist* roles in her current role as scheduler as it helped the process of scheduling much easier to keep down customer complaints and to assist

the technicians along the way of keeping the customer happy with their appointments being made and kept on time.

57. Plaintiff did a sufficient job as scheduler as she would take in approximately 70-120 calls per day during an 8- hour shift managing to get all of the customers scheduled for appointments with no corrective actions while she was employed as a scheduler.

58. Plaintiff contends she would often work with the *Regional Support Specialist* because they were the department to go to for manager approval to put a customer as a priority on a technician's schedule including special requests when a customer was missed the previous day and upset that their appointment was missed, these calls would take at a minimum 5-10 minutes sometimes up to 20-30 minutes.

59. Plaintiff contends good customer service such as this is crucial when you have an upset customer that is threatening to take action due to the unfulfilled service appointments and displeased service from a technician and or product issues.

60. Plaintiff contends often times technicians would be on her line in error, as a scheduler we were required to transfer the technicians to the *Regional Support Specialists* for support, but that she would give them department numbers they needed and or transfer them to the correct department instead of transferring them to the *Regional Support Specialist* to have the *Regional Support Specialist* transfer them again and or instruct them that they needed to contact a different department.

61. Technicians would need to order parts, get technical support while in the field, speak with a *Regional Support Specialist* to close their ticket, and I would have to be familiar with the scenario and transfer to the correct department. This was not common knowledge. Plaintiff had to be assertive and learn all the duties of the different departments. Plaintiff took the initiative on her own to learn the different functions of the different departments.

62. Learning the different functions of all the different departments was the hardest part of the position due to the amount of time it took to learn the different departments and their functions while performing my job duties. Transferring to correct departments saved time, and stress for the customer and fellow co-workers.

63. Plaintiff contends she learned the issues the technicians would be calling about and if it was not a confirmation, or a technician work schedule time issue, Plaintiff would assist the technician in getting to the correct department. Plaintiff contends the technicians would give their thanks to Plaintiff for saving them time, giving them the correct information regarding the department they needed to be transferred to, and preventing them from being transferred to a *Regional Support Specialist* when it was a different department they needed.

64. Plaintiff contends the *Regional Support Specialist'* she worked with often thanked Plaintiff for assisting technicians in instances when they did not need a *Regional Support Specialist* and instead got the technician to the correct department. Plaintiff contends it all worked out well, and that team work makes the dream work, and that she did the same in many other aspects of her role as scheduler with other departments such as the sales, and trouble-shooting department.

65. Plaintiff learned what departments the customer needed to be transferred to instead of transferring the customer to the incorrect department to later be transferred to a different department which happened a lot.

66. Plaintiff contends she had to make lots of notes to get the correct information and that it took her months to learn how to better assist the customer as well as her fellow co-workers all while performing her role as scheduler.

67. Plaintiff contends she requested her manager Nicole to do reviews and or mentor her, her handle time, her professionalism while on the line with customers and fellow co-workers including technicians for 3-6 months so that she would receive a high score on her performance reviews.

68. Plaintiff contends she received high scores on her performance reviews at the end of her being mentored by her manager. Plaintiff fears retaliation against former co-workers who did not participate in unlawful employment practices.

69. Plaintiff contends there were 1-2 weekly performance reviews called quality assurance reviews (QA) where the QA team would listen to Plaintiff on a call and grade the call, which the grading was strict. Plaintiff had to greet the technicians, and all fellow employees appropriately, actively listen to address all their issues, be polite, show empathy, close the call appropriately ask if you can further help, if there is anything else you can do to help, deescalate the issues, handle the call within 4 minutes. Plaintiff contends she had a call intake of 70-120 calls per day consistently to keep up with her quota, including helping fellow co-workers and that she did all she could to keep her position with Defendants ADT LLC. Plaintiff contends her first week in her position of scheduler she had an intake of 30 plus calls consistently and each week the calls increased with greater experience and skill as she learned her role, including assisting in other aspects of her role with fellow co-workers, and assisting with customer issues that were not part of her role as scheduler, such as sales, upgrades, trouble-shooting, part requests, requests to speak to service supervisors.

70. Plaintiff contends she did more than expected to be an ideal employee in her position, to be most professional, and supportive to the customer as well as fellow employees.

71. Plaintiff contends she had to learn the different aspects of the sales department because one part of sales was for upgrades, one part was for new customers, one department was for existing customers, one sales department did not take calls from customers, and Plaintiff had to through trial and error and from a list of complaints from customers that they had been transferred to the incorrect department, and from fellow co-workers that there were many different aspects of each department to learn the correct department depending on the customer's issue.

72. Plaintiff contends it took a lot of hard work and dedication to Plaintiffs employment position as a scheduler, and commitment to her employer Defendants ADT LLC, to fellow co-workers and to the customer to satisfy many of the requirements for good customer service in her role as scheduler.

73. Plaintiff contends her level of professionalism as required by Defendants ADT LLC improved while being mentored by her manager Nicole, and her manager was familiar with Plaintiffs work ethics and her manager did agree that Plaintiff had reached a level of work ethic and professionalism to apply for the *Regional Support Specialist* role. Plaintiff contends it is required that you get approval from your manager to apply for a different role after you have been in your current role for 6 to 12 months.

74. Plaintiff contends she had only a verbal consultation with her mentor regarding any incidents of how she handled a call and no written corrective actions of any kind in her role as scheduler.

   ### 5. **Prejudice Behaviors**

75. (B) On a claim in which an individual proves a violation under section 2000e-2(m) of this title *[section 703(m)]* and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court-

76. (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title *[section 703(m)]*; and

77. Plaintiff was evaluated based on her perceived personal characteristics which was prejudicial, as "Defendants" notated in their corrective action that Plaintiff "tone – "Whatchu you thing you need" when addressing a technician is inappropriate.

78. A person's language is considered a personal characteristic, and "Defendants" actions toward Plaintiff based on her language, and or use of is prejudicial, as they were perceived personal characteristics.

79. Prejudice can refer to unfounded pigeonholed beliefs and it may apply to "any unreasonable attitude that is unusually resistant to rational influence"[1]

### C. Statement of Material Facts

### 6. Discrimination/Racial Hostility/Hostile Environment/Racial Harassment

80. "Defendants" falsely created performance issues on February 10, 2022, February 22, 2022, and February 28, 2022 to aid Plaintiffs termination.

81. "Defendants" intentionally, maliciously, and falsely created performance issues because of Plaintiffs race (African American).

82. Had Plaintiff not been African American "Defendants" would not have created the false performance issues.

83. The written statement (corrective action) made by "Defendants" on February 10, 2022 infer racially inferior characteristics, and suggest Plaintiffs attitude, manner, and or nature is violative and or defiant.

84. "Defendants" namely Ashley Merrick training supervisor who is white, sabotaged Plaintiffs good performance evaluations by creating bad performance issues.

85. "Defendants" did not assess Plaintiff the same as her fellow co-workers.

86. Plaintiff performance was as good or better than that of her co-workers.

87. Plaintiff began at entry level and graduated to a skill level of Expert in her position.

88. "Defendants" activities of belittling, humiliating, and scorning Plaintiff led to her termination.

89. It was "Defendants" prejudiced act of placing Plaintiff in a "socially-formed category" ie., race (African American) that aided in Plaintiffs discriminatory treatment.[2]

90. "Defendants" continued to switch trainers during on-the-job training.

91. "Defendants" conspired to deprive Plaintiff of her promotion and employment.

92. "Defendants" namely trainer Samuel McLaughlin who is white, deceitfully told Plaintiff he would "not let her fail" the on-the-job training.

93. "Defendants" namely trainer Samuel McLaughlin who is white, would repeatedly say "ciao" to Plaintiff two days before Plaintiff was terminated. (Please see Exhibit 5)

94. "Defendants" on more than one occasion during training refused to communicate to Plaintiff, which inhibited Plaintiffs ability to work.

95. "Defendants" actions altered a term, condition, or privilege of Plaintiff's employment.

96. "Defendants" intentionally made Plaintiff's performance inadequate.

97. But for Plaintiffs race African American (black) Plaintiff would have received equal evaluations the same as my peers regarding performance evaluations, and disciplinary action.

98. "Defendants" refuse to correct their discriminatory actions.[3]

99. "Defendants" refused retraining to Plaintiff while letting other similarly situated white employees to participate in the training program.

100. "Defendants" refused on numerous occasions to train Plaintiff for her new position.

101. Plaintiff was unreasonably excluded from the training, apprenticeship, and or retraining program.

### D. Statement of Material Facts

### 7. Termination of Plaintiffs Employment

102. Plaintiff was terminated due to the bad performance issues created by "Defendants" namely Ashley Merrick, training supervisor who is white.

103. "Defendants" did not follow their own code of conduct policies.

104. Plaintiff filed a timely discrimination complaint with EEOC on March 7, 2022 the day of her termination and the complaint was officially filed 8-30-2022, charge no. 510-2022-03700.

105. EEOC issued a right to sue letter 9-1-2022.

106. "Defendants" treated Plaintiff like this because she is African American (black).

107. But for Plaintiff's race African American (black), she would not have been terminated.

108. Plaintiff would not have been subjected to the abundance of hostility from Defendants if she were not African American (black) but for her race.

109. The National Labor Relations Board found that "Defendants" wrongfully used disciplinary actions to wrongfully discharge an employee in the past.[4]

110. Plaintiff was forced to train with multiple trainers, Samuel McLaughlin who is white, Latoya Lunan who is black, Kara Marcon who is white, and Ashley Rioux, who is white.

**111.** Defendants harsh, unwarranted, prejudice treatment is the cause and or proximate cause of Plaintiffs injury.

### E. Statement of Material Facts

### 8. Failure to Investigate Plaintiffs Complaints

**112.** Plaintiff complained of "Defendants" bogus performance reviews and "Defendants" retaliated against Plaintiff by terminating her employment.

**113.** Plaintiff complained directly to the training staff Samuel McLaughlin, Latoya Lunan, Kara Marconi, and Nicole Kennedy, of her desire to overcome the barriers that were discriminatorily placed before her.

**114.** "Discrimination within the meaning of Title VII of the Civil Rights Act of 1964 can take many forms" [5]

**115.** Plaintiff and "Defendants" made an agreement implied, express or otherwise that a contractual obligation would be fulfilled.

**116.** "Defendants" in their offer of employment to Plaintiff presented a written statement, and or policy that discrimination is prohibited in their workplace.

**117.** "Defendants" failed to prevent discrimination in their workplace.

**118.** After inquiring about formal grievance procedures "Defendants" failed to provide any options to formally grieve her account of "Defendants" actions.

**119.** Plaintiff was intentionally excluded from her employment opportunity to be promoted.

**120.** "Defendants" technician employees have a union, and "Defendants" are familiar with or should be familiar with discrimination laws, yet "Defendants" repeatedly violate their own policies as well as laws against discrimination.

**121.** Plaintiff is not the only person to have complained about discrimination and retaliation.[6]

**122.** "Defendants" HR manager who is white, the operations manager in the department where Plaintiff was hired who is white, along with the training team all conspired to deny Plaintiff her promotion.

**123.** The management team knew of the discriminatory actions taken by the training team, and did nothing about it.

**124.** The management team did not prevent the actions committed by the training team.

**125.** "Defendants" have a history of retaliating against employees for opposing their discriminatory behavior.[7]

**126.** Many other current and former employees have complained of "Defendants" discrimination and retaliation.

**127.** "Defendants" failed to investigate Plaintiffs complaint regarding their bogus performance review and termination.

**128.** "Defendants" failed to acknowledge Plaintiffs complaint and or their actions toward Plaintiff as wrongful.

**129.** Many other current and former employees have complained of "Defendants" discrimination and retaliation.

**130.** "Defendants" Ashley Merrick, Samuel McLaughlin, Latoya Lunan, Kara Marconi, all made statements that they were acting within the scope of their employment.

**131.** "Defendant" Ashley Merrick stated: "it was the decision of the hirer ups", "they've all decided", when stating the decision to terminate Plaintiffs employment.

**132.** Plaintiff describes on numerous occasions where "Defendants" deliberately excluded her from training, deliberately took disciplinary actions against her for same or similar activity of her peers.

**133.** Plaintiff did reapply for a similar position before her termination.

### F. Statement of Material Facts

### 9. Discrimination and Harassment because of Race

**134.** "Defendants" gave inconsistent reasons for Plaintiff's bad performance evaluations.

**135.** Plaintiff's positive performance reviews are inconsistent with "Defendants", negative performance review of unprofessionalism.

**136.** Plaintiff received negative performance reviews because of her race, and her race was the reason for "Defendants" making negative performance reviews.

**137.** "Defendants" did not evaluate Plaintiff the same as her peers regarding performance and termination.

138. "Defendants" wrongfully used disciplinary actions in not promoting and discharging Plaintiff.

## G. Statement of Material Facts

### 10. False Disciplinary Actions

139. "Defendants" disciplined Plaintiff for opposing the treatment described herein.

140. "Defendants" knew Plaintiff had good performance reviews, and above average performance in her position.

141. "Defendants" knew Plaintiff had no attendance, and or corrective action issues when they terminated her for inability to perform her job duties.

142. "Defendants" knew Plaintiff was an ideal candidate for the promotion promised to her based on her good performance review.

143. If Plaintiff were not black the actions described herein would not have happened.

144. "Defendants" reason for terminating Plaintiff is false.

## H. Equal Employment Opportunity

145. Sections 102 and 103 of the Civil Rights Act of 1991 amends Title VII to permit jury trials and compensatory and punitive damage awards in intentional discrimination cases. The Civil Rights Act of 1991 Title I-Federal Civil Rights Remedies: Damages in cases of Intentional Discrimination sec. 102 42 USC 1981 sec. 1977A. Damages in cases of intentional discrimination in employment 42 USC 1981a.

146. The [EEOC] recognizes linguistic discrimination as national origin discrimination, and that "discrimination based on manner of speaking can be national origin discrimination" In re Rodriguez, 487 F.3d 1001, 1006-08 (6th Cir. 2007).

## I. Statement of Material Facts

### 11. ( Challenged Actions)

147. Plaintiff brings her causes of action Discrimination and Retaliation

148. Title VII "has prohibited employers from discriminating against their employees on any of seven specified criteria: race, color, national origin, … , are personal characteristics set forth in section 2000e-2". Discrimination based on any one of these five characteristics, often referred to as status-based discrimination.

149. One category of wrongful employer conduct, the employee's opposition to employment discrimination, and the employee's submission of or support for a

complaint that alleges employment discrimination are wrongs based on types of protected employee conduct. *University of Texas Southwestern Medical Center v. Nassar, 570 U.S.* 338, 347 (2013)

**150.** "Defendants" intentionally deprived Plaintiff of her promotion by falsely creating performance issues, and disciplinary action to discharge her from her employment because she opposed their treatment.

**151.** "Defendants" intentionally deprived Plaintiff of an equal employment opportunity, training because of her race.

**152.** "Defendants intentionally deprived Plaintiff of an equal employment opportunity that is to be employed because of her race.

**153.** "Defendants intentionally deprived Plaintiff of an equal employment opportunity related to the terms, and conditions of her employment by creating a hostile work environment, when they refused to train her, and by treating her unfavorably and different than similarly situated white employees.

**154.** Plaintiff has described the unfavorable treatment throughout her complaint.

**155.** Plaintiff has described the hostile work environment throughout her complaint.

**156.** Plaintiff has described similarly situated white employees that were treated different than Plaintiff throughout her complaint.

**157.** Plaintiff has described the adverse treatment complained of and or committed by "Defendants throughout her complaint.

**158.** Plaintiff contends the adverse treatment is due to her race, and her opposing the "Defendants" discriminatory treatment.

**159.** Plaintiff contends but for her race she would not have been subjected to the perceived intentional race discrimination from "Defendants".

**160.** Plaintiff contends she has described the perceived discriminatory treatment of "Defendants".

**161.** Plaintiff contends she has described the injury caused by "Defendants" negligence.

**162.** "Defendants" showed prejudice towards Plaintiffs "language" and "how she speaks" in their corrective action. The Court found in, In re Rodriguez, 487 F.3d 1001, 1006-08 (6th Cir. 2007) that an employee was not selected for promotion based on a manager's impression about the applicant's "language" and "how he speaks."

**163.** "Comments that directly suggest the existence of bias; no inference is necessary" Brown v. East Mississippi Electric Power Ass'n, 989 F.2d 858 (5th Cir. 1993) See Okoye v. Univ. of Texas Hous. Health Sci. Ctr., 245 F.3d 507, 514 (5th Cir. 2001) (explaining that in disparate treatment cases involving employee misconduct and discipline, a "plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct for which the plaintiff was discharged was nearly identical to that engaged in by other employees").

**164.** Other white employees repeatedly had questions up to the last day of training. Plaintiff's co-workers in the same training class had questions throughout the training period including up until the last day of training, received support, and were instructed to continue to reach out for support after training with no incident and or corrective action, no belittlement, no discharge from employment, and thanked for doing a good job during training. Plaintiff would also like to reference the following statement as support for her adverse treatment contention.

**165.** Plaintiff also would like to reference the following in support of Defendants intent, liability, intent to harm, negligence and to assert Defendant's knowledge that they intentionally denied Plaintiff the same opportunity to enhance her skills learned during training the same opportunity given to the other white employees in the training class.

   A. *Defendant Bruce Roepke* who is white, reached out to the chat for support on March 4, 2022 at least (7) seven times as noted in *Plaintiffs Exhibit 3*.

   B. *Defendant Josh Harvey* who is white, reached out to the chat for support on March 4, 2022 at least (11) eleven times as noted in *Plaintiffs Exhibit 3*.

   C. *Defendant Amy Allums* who is white, reached out to the chat for support on March 4, 2022 at least (13) thirteen times as noted in *Plaintiffs Exhibit 3*.

   D. *Defendant Stacey Taylor* who is white, reached out to the chat for support on March 4, 2022 at least (11) eleven times as noted in *Plaintiffs Exhibit 3*.

   E. *Defendant Martina Deshays* reached out to the chat for support on March 4, 2022 at least (5) five times as noted in *Plaintiffs Exhibit 3*.

   F. *Defendant Joshua Harstick* who is white, reached out to the chat for support on March 4, 2022 at least (2) two times as noted in *Plaintiffs Exhibit 3*.

   G. *Defendant Jennifer Harvey* who is white, reached out to the chat for support on March 4, 2022 at least (2) two times as noted in *Plaintiffs Exhibit 3*.

H. *Defendant Whitney Critton* reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3*.

I. *Defendant India Carroll* who is white, reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3*.

J. *Defendant Takeesha Whitlock* reached out to the chat for support on March 4, 2022 at least (4) four times as noted in *Plaintiffs Exhibit 3*.

K. *Defendant Madison Houchin* who is white, reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3*.

L. *Defendant Kayla Schultz training lead* who is white, responded to *Defendant Bruce Roepke*, "Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests"

M. *Defendant Kayla Schultz training lead* in her response below to *Defendant Bruce Roepke* on March 7, 2022 when he stated he was "*getting overrun here. Help please!, I'm about 3 hours behind,*" stated, "*Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests, Also reach out to your manager and see if they can assist with the chat reuqests, letting them know you are getting bogged down with requests, I got Layota helping in the chat as well; Monday's can get crazy, hang in there we're getting you some help*". 🙂

N. [Yesterday 2:31 PM] Simon, Sarah (*training lead Defendant Sarah Simon responding to Defendant Bruce Roepke when he needed help.*)

O. Roepke, Bruce add me to your chat please

[Yesterday 2:46 PM] Roepke, Bruce (*Defendant Bruce Roepke asking for help with task to clear a tech for the next job*)

Gone one I'm trying to get a confirmation on and I have some questions on it.

[Yesterday 2:46 PM] Roepke, Bruce

got not gone

[Yesterday 3:17 PM] Roepke, Bruce

I'm getting overrun here. Help please!

like 1

[Yesterday 3:19 PM] Schultz, Kayla

16

**Plaintiffs Supplemental Statement of Claim in Response to the Courts Findings, Conclusions, and Recommendation**

Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests.

like 1

[Yesterday 3:19 PM] Schultz, Kayla

Also reach out to your manager and see if they can assist with the chat requests, letting them know you are getting bogged down with requests. (*training lead Kayla Schultz instructing the on-the job training group to reach out to the Regional Support Managers for support once they are out of training*)

[Yesterday 3:20 PM] Roepke, Bruce

Yeah, I've put it in the chats. I'll add a mgr too, but mine is off today

[Yesterday 3:20 PM] Roepke, Bruce

I'm about 3 hours behind

[Yesterday 3:24 PM] Schultz, Kayla

I got Layota helping in the chat as well

[Yesterday 3:27 PM] Roepke, Bruce

Thanks. This has been intense.

[Yesterday 3:28 PM] Schultz, Kayla

Monday's can get crazy, hang in there we're getting you some help 

[Yesterday 3:28 PM] Schultz, Kayla

The techs also know that if they need confirmation they can call the fosc

[Yesterday 3:28 PM] Roepke, Bruce

I'll start on my EOD once I'm done with this confirmation and the phone call

[Yesterday 3:42 PM] Roepke, Bruce

17

**Plaintiffs Supplemental Statement of Claim in Response to the Courts Findings, Conclusions, and Recommendation**

Thanks for all the help.

heart 1

## 12. **Right of Recovery**

**P.** (a) right of recovery

42 USC 2000 an employment discrimination claim against a recipient of Federal Financial assistance that otherwise might raise a Title VI issue must be brought under *Title VII of the Civil Rights Act* of 1964, as amended, 42 USC sec 2000e., if a primary objective is not employment.

See *N. Haven Bd. Of Educ. v. Bell*, 456 U.S. 512, 530 (1982) the legislative history thus corroborates our reading of the statutory language and verifies the court of appeals conclusion that employment discrimination comes within the prohibition of Title IX. *Bentley v. Cleveland Cty. Bd. Of Comm'rs* 41 F.3d 600 (10th Cir. 1994) (Sec. 504 claim alleging discriminatory termination of former employee).

Courts also have held that Title VI adopts or follows the Fourteenth Amendment's standard of proof for intentional discrimination, see Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 412-18 (1978); and, generally, the Title VII standard of proof for disparate impact. See *Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 639 (1983); *Elston v. Talladega Cty. Bd. Of Educ.*, 997 F.2d 1394, 1405 n.11, 1407 n.14 (11th Cir. 1993)(see, infra, Section V, ch 1). Accordingly, cases under these constitutional and statutory provisions may shed light on the Title VI analysis in a given situation.

Finally, cases decided under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C. Sec. 3601 et seq., may also be instructive regarding the disparate impact analysis under Title VI.[8]

The 1991 amendments added the legal remedies of compensatory and punitive damages and the right to trial by jury for those remedies. 42 U.S.C. Sec. 1981a(a)(1). Title VII plaintiffs now may recover injunctive and other equitable relief, compensatory and punitive damages, and attorney's fees. 42 U.S.C. Sec. 1981a(a)(1), 2000e-5(g)(1), (k). *The Civil Rights Act of 1991* amended Title VII.

### **<u>Prayer</u>**

Plaintiff now prays the Court will grant her leave to proceed with her complaint and hereby objects to the Courts Findings, Conclusions, and Recommendation.

Done this 12th day of June 2023.

Sonya Chapman

Pro Se

*Sonya Chapman*

1533 Honey Trl
Glenn Heights, Texas
75154

## CERTIFICATE OF SERVICE

I, Sonya Chapman do hereby certify that I have submitted an electronic copy via the courts website and the same is made available to the Attorney for Defendant Brent Sedge at the following address; 500 N. Akard Street, Suite 3550, Dallas, Texas 75201
This 12th day of June, 2023.

---

[1] en.wikipedia.org/wiki/Prejudice

[2] en.wikipedia.org/wiki/Prejudice

[3] https://www.indeed.com/cmp/Adt-1/faq/if-you-were-in-charge-what-would-you-do-to-make-adt-a-better-place-to-work?quid=1c4v4

[4] National Labor Relations Board-Administrative Judge Opinions 16-CA-144548 (N.L.R.B. Nov. 16, 2018)

[5] https://www.eeoc.gov/laws/guidance/cm-604-theories-discrimination

[6] https://www.indeed.com/cmp/Adt-1/reviews/it-used-to-be-fun-20-years-ago-now?id=c0186ea42af64565

[7] National Labor Relations Board-Administrative Judge Opinions 16-CA-144548 (N.L.R.B. Nov. 16, 2018)

[8] https://www.ce9.uscourts.gov/jury-instructions/node/166

**Plaintiffs Supplemental Statement of Claim in Response to the Courts Findings, Conclusions, and Recommendation**