In the United States District Court for the Northern District of Texas

Dallas Division

| | | |
|---|---|---|
| Sonya L. Chapman | § | |
|        Plaintiff | § | |
| V. | § | No. 3:22-cv-2188-D-BN |
| | § | **Jury Demand** |
| ADT LLC et seq | § | |
|        Defendant | § | |
| | § | |

## Plaintiff's Second Amended Complaint

Comes now, Sonya L. Chapman, Plaintiff in the above-styled case, and files her Second Amended Complaint pursuant to Fed. R. Civ. P.15. Plaintiff seeks damages compensatory, exemplary, punitive, equitable relief, declaratory, and all other relief entitled.

## I.        Jurisdiction and Venue

I.  This action is brought under the provisions of The Civil Rights Act of 1964 (Title VII 2000e et seq), Title 42 of The United States Code including but not limited to sections: 1981(a)(1) for statement of equal rights, right of recovery, 1981 (b) for compensatory and punitive damages; 1981(c) Demand for Jury Trial; 1982 Property Rights of Citizens; 1983 Civil Action for Deprivation of Rights; 1985(2) (3) Conspiracy to interfere with civil rights; 1986 Action for Neglect to Prevent; 14th Amendment Due Process Clause; Texas Commission on Human Rights Act (TCHRA); Age Discrimination in Employment Act of 1967 (ADEA) Texas Labor Code Chapter 21; 28 USC 1343; 28 USC 1331; 28 U.S.C. 1367. Title VII plaintiffs now may recover injunctive and other equitable relief, compensatory and punitive damages, and attorney's fees. 42 U.S.C. 1981a(a)(1), 2000e-5(g)(1)(k).[1]

II.  This court has exclusive jurisdiction over Title VII constitutional claims[2], ***Mata v. ILD Telecommunications Inc***. No: SA-04-CA-0491-XR (W.D. Tex. Oct. 4, 2004). Plaintiff, has pleaded constitutional discrimination claims of race, age, and sex discrimination.  In ***Mathis v. City of Dallas*** No. 3:20-cv-0655-M-BH (N.D. Tex. Dec. 30, 2020) the court found it can exercise jurisdiction over a defamation claim. The laws are clearly established when an employer violates the provisions of the law's they are liable for damages.

---

[1] https://www.ce9.uscourts.gov/juryinstructions/node/166#:~:text=Title%20VII%20plaintiff%20now%20may,statutory%...

[2] Mata v. ILD Telecommunications Inc. No: SA-04-CA-0491-XR (W.D. Tex. Oct. 4, 2004).

III.     Plaintiff in an attempt to make a plea to the jurisdiction listed various sections of the law that authorizes damages for violations of those laws, and or sections of those laws as well as condemn violations of said laws in an attempt to comply with jurisdictional plea requirements.

IV.     Plaintiff invokes and appeals to this court's pendant jurisdiction over all of her claim's both state and federal. The court can exercise jurisdiction over state and federal claims arising under the same set of facts and or issues. When the Defendant has sufficient contacts with the forum state and the claim involved arise out of those contacts.[3] "[t]he court can exercise personal jurisdiction apart from the requisite contact and the additional factors to be considered are:"[4]:

1.  Interest of Plaintiff in getting relief.

2.  Forum state's interest in the case.

3.  Systemic interest in 'efficient resolution of controversies",

4.  Systemic interest in "fundamental substantive social policies", and

5.  Actual burden of the defendant.

V.     According to **Burlington Industries. Inc. v. Ellerth** 118 S.Ct. 2257, **Hatley v. Hilton Hotels Corp** 308 F.3d 473 (5th Cir. 2002) these actions by the employer are actionable by Plaintiff. Employment action taken by supervisor becomes the act of the employer for Title VII purposes. Civil Rights Act of 1964 701 et seq, 701(b), 42 USCA 2000e et seq, 2000e (b).

VI.     *Fed.R.Civ.P 8* (a)(1) a pleading which sets forth a claim for relief, whether a … shall contain (1) a short and plain statement of the grounds upon which the court's jurisdiction depends, unless the court already has jurisdiction and the claim needs no new grounds of jurisdiction to support it, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Relief in the alternative or of several different types may be demanded. This court already has jurisdiction, and per the above federal rule this claim needs no new grounds of jurisdiction to support it. Plaintiff submits a further plea to the jurisdiction due to the "Defendants" motion to dismiss, and the courts order for Plaintiff to file an amended complaint.

*Entitlement to relief*: Title VII provides recovery for compensatory and punitive damages for intentional discrimination, to include future pecuniary, and non- pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life pursuant to 42 USC 1981 (a). In **Ruffin v. Baker** No. 4:09-cv-2222 (S.D. Tex. Mar. 25, 2010) the court held that

---

[3] https://civilprocedure.uslegal.com/jurisdiction/generalspecific-jurisdiction-test

[4] https://civilprocedure.uslegal.com/jurisdiction/overall-reasonableness-test

to survive a Rule 12 (b) (6) motion to dismiss, a complaint 'does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief. Plaintiff herein submits her grounds for entitlement to relief. Plaintiff has made a plea to this court having subject matter jurisdiction in this her amended pleading.

VII.    Punitive damages under Title VII are available if the discriminatory practice is 'with malice or with reckless indifference to the federally protected rights of an aggrieved individual" back pay including but not limited to lost wages, benefits Plaintiff would have received, compensatory, and punitive damages, pecuniary and non-pecuniary losses, including suffering, mental anguish, inconvenience, and loss of enjoyment of life. Pursuant to 42 U.S.C. 1981 (a). The ADEA provides for recovery injunctive relief and lost wages, and liquidated damages in the same amount as the lost wages.

VIII.    Declaratory relief Plaintiff requests injunctive relief in the case the court finds Plaintiff is entitled to reinstatement of her employment or equitable relief. Injunctive relief to prevent Defendants from continuing their practice of denying an employee equal employment opportunity during training, making false performance reviews, to prevent retaliation for opposing said treatment, and to prevent Defendants from taking disciplinary actions against an employee during on-the-job training and to have a process for training when they do not have appropriate measures otherwise.

IX.    While Plaintiff is being scrutinized by "Defendants" based on the courts pleading standards, "Defendants" are arguing procedural matters that do not support their motion to dismiss. Plaintiff submits her second amended complaint, and contends discovery is needed to perfect facts. "Defendants" in their motion to dismiss plead Plaintiff failed to state a claim in law or fact upon which relief can be granted. Plaintiff contends Defendants argument is general and not specific. Defendants do not state what part or where in Plaintiffs complaint a claim is not stated. Plaintiff made numerous claims, and this makes it difficult for Plaintiff to respond directly to Defendants motion to dismiss and makes it difficult to amend her complaint as the court did not note which claims required amendment. ***EMC Mortgage Corp. v. Mortgage IT***, 2006 WL 42286676, at *1 (N.D. Tex. Oct. 12, 2006) (quoting ***Lowery v. Tex. A M Univ. Sys***., 117 F.3d 242, 247 (5th Cir. 1997).  Lopez v. Star Tex. Gasoline & Oil Dist. No. 2:14-cv-52 (S.D. Tex. May. 2, 2014) states "a F.R.C.P 12 (b) motion to dismiss tests the formal sufficiency of the statement of a claim for relief. It is not a procedure for resolving disputes about the facts or the merits of a case".

X.    Qualified immunity affords protection against individual liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. ***Pearson v. Callahan*** 555 U.S. 223, 231. First Plaintiff must claim that the defendant committed a constitutional violation under current law. Second,

he must claim that the defendant's action were objectively unreasonable[5] in light f the law that was clearly established at the time of the action about which he complained.

 "Defendants" in their motion to dismiss did not specify or plead in detail their reasons for their motion to dismiss. "Defendants" had this case removed to this court and plead complete diversity. "Defendants" did not present sufficient facts to make out a prima facie case supporting diversity jurisdiction. ***Central Freight Lines Inc***., 322 F.3d at 380 (citing ***Alpine View Co***., 205 F.3d at 214). "Defendants" have sufficient contacts in the forum state. "Defendants" have offices at 3220 Keller Springs Rd, Carrolton, Texas 75006, 1801 N. Hampton Rd. #280, DeSoto Texas, 75115, 8880 Esters Blvd, Irving, Texas 75063, 145000 Trinity Blvd #118, Fort Worth, Texas 76155, as well as other business ventures such as a remote workforce in Texas the forum state. Plaintiff asks this court to decide jurisdiction over her state law claims.

XI.   Plaintiff is not arguing this court does not have jurisdiction, Plaintiff is arguing this court has supplemental, concurrent, and personal jurisdiction over her state law claim(s).

XII.   This court does have authority, and discretion to hear all the issues in Plaintiffs complaint. "Defendants" cannot avoid liability due to diversity, and or subject-matter jurisdiction. "Defendants" do business in the forum state with the established set of contacts and personal jurisdiction does apply in cases involving "personal jurisdiction and internet transactions"[6] .

XIII.   Plaintiff contends that complete diversity does not exist where a defendant has established contacts. This court has subject-matter jurisdiction over civil rights cases, as well as concurrent jurisdiction over state law cases. Plaintiff asks the court to decide according to 28 U.S.C. 1367 and other procedural laws, and or laws she is entitled to, to hear her state law claims and not to dismiss for failure to state a claim. The court found a dispute of "material fact" regarding defendant's base of operations in ***Blythe v. Offshore Serv. Vessels*** No. 17-5184 Section: "G" (4) (E.D. La. Sep. 30, 2019). "Defendants" "have offices, employee, agents, or places of business in Texas to constitute the requisite substantial, continuous and systematic contacts required for finding personal/general jurisdiction" (***Blythe***).

---

[5] MacRis v. Saxton (In re Saxton) No. 10-44412-RFN (Bankr. N.D.Tex. June. 8, 2011). The court noted "slander is an intention tort, and malice is implied". "One does not call another person dishonest and "a thief" without the subject intent to harm his reputation.

[6] ***Zippo Mfg. Co. v. Zippo Dot Com, Inc***. 925 F. Supp. 1119 (W.D. Pa. 1997) "Our authority to exercise personal jurisdiction in this case is conferred by the state law. F.R.C.P. 4(c); ***Mellon***, 960 F.2d at 1221. "The extent to which we may exercise that authority is governed by the Due Process Clause of the Fourteenth Amendment to the Federal Constitution. ***Kulko v. Superior Court of California***, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978). "Defendants who "reach out beyond one state' and create continuing relationships and obligations with the citizens of another state are subject to regulation and sanctions in the other State for consequences of their actions.." Id. (citing ***Traverlers Health Assn. v. Virginia***, 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950). "The foreseeability that is critical to the due process analysis is … that the defendant's conduct and connection with the forum State are such that he should reasonably expect to be haled into court there". ***World Wide Volkswagen Corp. v. Woodson***, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

## II.    Plaintiffs Statement of Facts

1.  **Who**: Defendants ADT LLC, including but not limited to Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name, April trainer, not sure of the last name, Kara Marconi, and Ashley Rioux .

2.  **What**: Conspiracy to Deprive Plaintiff of her constitutional right to protection of 42 U.S.C 1985 (2) obstructing justice or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class or persons, to the equal protection of the laws; 42 U.S.C. 1985 (3) depriving persons of rights or privileges: in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against and one or more of the conspirators. to the pursuit of happiness, right to property, right to free speech. Defendants intentionally, individually, and collectively deprived Plaintiff of her employment when she was terminated during on-the-job training because of her behavior and or lack of performance. "Defendants" intentionally deprived Plaintiff of income from her employment. "Defendants" intent was to conspire to deprive Plaintiff of income from her employment while abusing their authority as an employer.

    "Defendants" intentionally tried to avoid any review and complaint of their actions and or cover their tracks by placing Plaintiff with several different trainers during training. The negative performance reviews are suspect because Plaintiff trained with numerous trainers, yet she received likely negative performance reviews from all trainers, and or an equivalent to negative performance reviews from all the different trainers, warranting termination. Plaintiff will need to proceed to discovery the matters of the performance reviews of each of the trainers to confirm their reviews.

    "Defendants" gave no legitimate reason or explanation for requiring her to train with so many different trainers in one instance Plaintiff trained with a different trainer on a daily basis for at least a week of the training during the week of the corrective actions. Plaintiff recalls training with Latoya Lunan, Samuell McLaughlin, Kara Marconi, Ashley Rioux, and two other trainers April, and one other male trainer briefly.  Plaintiff was led to believe by "Defendants" that all the different trainers was their way of trying to help Plaintiff train better and or learn the material or duties of the position.

    This also is suspect, because this forced Plaintiff to learn a different training style of each trainer daily, forcing Plaintiff to refocus on the particulars of each of the different trainers instruction, and or teaching style daily, while focusing on what was being taught.

Plaintiff contends these actions are suspect because "Defendants" did not see their actions as discriminatory, even though no other trainees were being required to train with so many different trainers… .

Plaintiff felt that training with so many different trainers was discriminatory due to "Defendants" explanation that they were trying to help Plaintiff learn the materials during training by requiring her to train with numerous different trainers, as the training with so many different trainers was a distraction in many aspects. Also, Plaintiff could have benefited from training with one trainer for the duration of the training, and followed up later if she required more assistance. All said this behavior of "Defendants" was offensive in that "Defendants" came back and said Plaintiff was unprofessional, and unable to perform her job duties, causing insult to injury.

All the different trainers had a different training style, trainer, Latoya Lunan, was verbal for much of the training, and her instructions regarding making notes to the tickets were different than the other trainers on making notes to the technician tickets when doing am and pm checks and in general.

"Defendant" trainer, Samuel McLaughlin training style was different in that he did not go over OPS as thorough as the rest of the trainers. He also tried to convince me that he would not let me fail the training class, by telling me he would not let me fail. Samuel was not genuine, he treated me with a superior attitude throughout my training days with him. He demanded I not go over my notes during leisure time such as the few minutes in the morning before the training class started, because he said I should not be on the company computer when I am not working and or before my shift starts. He sent me a message in teams asking me to not logon to my computer a few minutes early.

"Defendant" trainer, Samuel McLaughlin used intimidating remarks such as "ciao" during the time Plaintiff trained with him. Plaintiff took this remark as intimidation because it was said out of context, on several occasions during at least two different training days Plaintiff trained with him. Plaintiff thought why would he out of nowhere say "ciao", when that is the only word, he said.

"Defendant" trainer Ashley Rioux, was thorough in her instructions clearing a technician in that she allowed Plaintiff to ask as many questions needed to perform until Plaintiff was confident, and until she had learned to do them correctly. Plaintiff contends it is likely trainer Ashley Rioux did not give a positive report and or performance evaluation regarding Plaintiffs progress and performance. Plaintiff contends discovery of the reports and performance evaluations is important to show "Defendants" reason for Plaintiff's termination is false and requests discovery.

It is Plaintiffs contention that "Defendants" did not want her to take notes that she could refer to in order to prevent her from retaining what was being taught, and to prevent her from being successful in her new role, to make sure she would struggle with performing her new role.

Plaintiff in good faith accepted "Defendants" reason, and or explanation of why she was training with so many different trainers. "Defendants" reason and or explanation was contradicting, coupled with corrective action and negative performance reviews. Plaintiff asked training manager Ashley Merrick, if she had a chance at retaining her position even though she had received the first two corrective actions, and she training manager Ashley Merrick said yes.

"Defendants" required Plaintiff to train for an additional two days, stating Plaintiff got two extra days to train when the rest of the training class did not, again covering their tracks to avoid accountability for their actions and or harassing treatment during training. Plaintiff contends requiring her to train with so many different trainers, preventing Plaintiff from taking notes, writing corrective actions determining Plaintiff was unprofessional, terminating Plaintiffs employment for lack of performance is harassment and retaliation for Plaintiffs opposing the treatment.

There are main functions of the job position which are to troubleshoot the problem using software with the technician prior to closing the service ticket, to clear the system tests prior to closing the ticket for service, to clear a ticket once a technician has completed the service. Closing a ticket requires all of the above, troubleshooting the system, clearing the systems tests, and then closing the ticket.

A Regional Support Specialist also has to know the different system types, and what software applies to the specific system when addressing a problem and or service request. Assisting a technician with repair services such as reconnecting a system, replacing and reconnecting a system, trouble shooting the problem with knowledge of the system and steps to troubleshoot the issue is required.

Plaintiff had learned all the different types of systems, learned the steps to take to resolve all issues on all the software used to troubleshoot the problem that was introduced to her. Plaintiff was learning the different issues the technicians encounter when repairing and diagnosing a problem. The technicians were instrumental in assuring all of the steps were followed as well due to their knowledge of troubleshooting, and or repairing a problem.

It is impossible for a new Regional Support Specialist to not have questions, because all the issues that may arise during training are not covered in training. In some cases, the issue has to be addressed as it appears. A Regional Support Specialist is responsible for doing am and pm checks with the technicians to assure they will arrive on time to their appointments which is not a difficult task to perform for 15 to 20 technicians. A report after each check is done is required, the report includes the name of the technician, the time the technician started their day, the time arrived to first appointment, the name of their manager, and area they are working. This report has to be emailed to the area managers, including the service managers, and operations management teams.

Once you are done doing am checks, you perform opens, pending, scheduled "OPS" which is a check for services that have not been scheduled, need to be rescheduled, and or that are scheduled and need to be verified for whatever reason. You have to sure that all tickets have been addressed and assigned the appropriate code once addressed, that is open, closed, scheduled, and or pending. This does include calling the customer at times to verify the service status, and may include rescheduling, updating the service request with any new concerns, and or changes.

There are other Regional Support Specialist assigned to your specific area that work the same "OPS" as you are working, they are worked as a team. All Regional Support Specialist have the duty of working "OPS" as explained to Plaintiff and they all are working the same set of accounts when performing "OPS" until they are completed for the day.

At the end of the day, a Regional Support Specialist does pm checks. This is checking with the technicians to be sure if they will make their pm appointments on time, whether an appointment needs to be rescheduled, and or reassigned to a different technician. Notations to the service ticket whether the technician will be on time, late, needs to reschedule, or reassigned are required after check ins. An end of day report and email is required to be sent to the management teams at the end of day. Plaintiff has more than 15 years sending emails. Plaintiffs previous position with "Defendants" as scheduler required emails to be sent to leadership, and management on a daily basis.  "Defendants" in their corrective action says Plaintiff took an hour to send an email.

Plaintiff contends the reason it took so long to send the morning email, was due to the trainer giving instructions regarding the email that took so long for the email to be sent. Plaintiff contend on the days she was not being instructed on how to send the email; it did not take as long to send the email. Plaintiff contends her training was interrupted continuously by "Defendants" continuing to instruct her on the processes while inhibiting her from applying what she learned during the training including but not limited to requiring her to train with more than four different trainers, preventing Plaintiff from taking and using notes, and by writing her corrective actions, and all that is involved in writing and or receiving a corrective action. Plaintiff contends receiving the corrective actions during training was distracting, the threat of termination via the corrective actions, training with so many different trainers for no legitimate explanation other than to help Plaintiff learn the materials, being scrutinized in a negative light by numerous supervisors, trainers, and leads is abusive, and extreme.

"Defendants" decorated themselves as saints and portrayed Plaintiff as the villain in their corrective action, and actions towards Plaintiff during on-the-job training. Plaintiff was deemed unable to do anything correctly, and as required for the job position.

A Regional Support Specialist is required to assist the sales team with scheduling large installation appointments due to the number of technicians needed. Also, the Regional Support Specialist assists other team members in the scheduling department with requests for sooner service requests from a customer. Plaintiff was a scheduler prior to her

promotion to Regional Support Specialist. The scheduler duties include working with the Regional Support Specialist on occasion when the customer is escalated, requests a sooner appointment, during emergency service requests. The software the scheduler uses to locate sooner appointments is the same software the Regional Support Specialist uses to find sooner appointments.

To find a sooner appointment you sometimes have to locate an appointment according to the technician's schedule, when an available appointment does not populate in the scheduling system called the calendar. To locate an appointment using the technicians schedule searching the technician's skill set, and availability is needed. The position of scheduler is not required to have these skills but is a plus if they do because it saves time when searching for a sooner appointment.

Plaintiff learned how to search for a skilled, available technician for sooner service when she worked as a scheduler. Speed is of great importance because all the calls are timed four (4) minutes per call to schedule an appointment, the number of calls you take per hour are considered when grading, the number of calls you take per day are considered when grading, and are used on a grading scale and used for performance evaluations which determine if an employee will remain employed, considered for promotion, and bonuses.

A scheduler takes calls directly from the customer and the sales team to schedule appointments. Requests are often made for sooner appointments, and or for emergency services. When these requests are made the scheduler has to consult with a Regional Support Specialist (the position in question). Sometimes calls come from transfers from other departments to assist with scheduling a sooner appointment, or emergency service appointment. All the skills a scheduler can acquire to schedule the sooner service request, and emergency service requests are a plus. These skills are not fully explained or taught during training for the scheduler position, or the Regional Support Specialist position.

Plaintiff had many of these skills when promoted to Regional Support Specialist from previously working as a scheduler. Plaintiff has other phone skills that include telemarketing, call center customer service, and retail customer service together that combine over 10 years of experience in customer service. Plaintiff has call center customer service skills, including multitasking different software programs, working with multiple screens etc.

Plaintiff used the same software in the scheduling department that is used for the Regional Support Specialist role to schedule technician appointments. The major difference was the role of doing check ins with the technician's for am and pm checks, the authority to work with the managers in operations directly, the ability to adjust the technicians schedules to facilitate scheduling, or rescheduling appointments, and assisting

technicians with closing out a ticket including but not limited to system checks, trouble shooting system issues, assist with part requests such as ordering parts, and or verifying parts are ordered, and checking the availability of parts.

Parts related issues were also addressed by Plaintiff as a scheduler, and was a job function as a scheduler. The sales team requested parts when scheduling a work order, a customer may be expecting a part they did not receive. Plaintiff mentions that parts are addressed because "Defendants" made a statement as to Plaintiffs inadequate handling of a call from a customer related to parts. Plaintiff had experience with part issues, and "Defendants" assessment that Plaintiff is not skilled in how to address an issue related to parts is incorrect. Please see Case No. 3:22-cv-01288-D-BN, Dkt. 12-2 page 3 of 7.

As a scheduler you did not have the authority to work directly with the mangers in operations, you had to get assistance from the Regional Support Specialist when assistance from an operations manager is needed to schedule some sooner service or emergency service requests. These services have to sometimes be approved when making changes to a technician's schedule.

Plaintiff contends being required to train with so many different trainers is out of the ordinary. Plaintiff contends training with so many different trainers in such a short period of time, can be distracting, intimidating, and viewed in a negative light, but "Defendants" insisted it was to help Plaintiff.

"Defendants" insisted they were doing what was best by requiring Plaintiff to train with many different trainers to try to better assist Plaintiff with learning the materials during training, while it turned out that "Defendants" were eliminating Plaintiff from her employment.

Plaintiff contends "Defendants" harassed her by requiring her to train with numerous different trainers, by not allowing her to take notes, ie., "Defendant" Samuel McLaughlin telling Plaintiff to use his notes, and to do as he tells me and not to worry about anything else", writing corrective actions saying things that were not true such as Plaintiff was avoiding end of day reviews by not being on her phone at the end of the day, until it is time to clock out.

Plaintiff contends "Defendants" used intimidation, harassment, false corrective action, all to prevent her from both making a complaint, and to avoid taking responsibility for their actions. It appeared to Plaintiff it was too late after the second corrective action, to reach out to the Employee Assistance Program, and futile because "Defendants" were determined to end Plaintiffs employment.

Plaintiff contends the "Defendants" worked together, conspiring to intimidate, harass, and make false corrective actions, and negative performance reviews by jointly and individually requiring Plaintiff to train with numerous different trainers, and reporting that she was unprofessional, and unable to perform her work duties, ending with termination of Plaintiffs employment.

Plaintiff contends "Defendants" retaliated against her for simply opposing their treatment, and that she simply opposed their treatment by continuing to request to take notes, by

continuing to take notes, using "Defendants" software on their computers, as it was the only way "Defendants" would allow her to take notes, and by arguing that she was being treated unfairly by receiving corrective actions for asking questions during training when all the training class had continued questions, and that the overall treatment she was receiving was unfair, partial, prejudiced, and or discriminating.

"Defendants" stated they terminated Plaintiffs employment due to her lack of performance during on-the job training without affording her the opportunity to dispute or appeal their decision. Plaintiff filed a complaint with the EEOC and with this court for redress.

"Defendants" individually, jointly, and collectively made a false report saying Plaintiff intentionally refused to log back in to work, accused Plaintiff of abandoning her work position by "logging back in saying nothing" and "stepping away and come back when it's time to clock out", all of which is untrue. Plaintiff cannot provide facts, material, and or documentation to support this contention due to the courts refusal to allow Plaintiff discovery.

Plaintiffs record of logins; and personnel record are inaccessible to Plaintiff. Plaintiff submitted a corrective action "Defendants" presented to Plaintiff while Plaintiff was on-the-job training as supporting evidence that "Defendants" did say these things. Please see Case No. 3:22-cv-02188-D-BN Dkt. No. 12-2 pages 3-7. "Defendants" in their corrective action stated Plaintiff stepped away and come back when it's time to clock out avoiding review. Plaintiff was offended by these accusations, as they are false, as they portray Plaintiff in a negative light suggesting Plaintiff is being dishonest having improper work ethics, bad character, and harms her reputation.

All of the acts complained of herein during Plaintiffs on the job training were offensive, insulting, and intimidating in that, "Defendants" made written statements ridiculing, mocking Plaintiffs word choices. "Sonya's tone "Whatchu thing you need?", "Sonya talks herself into confusion then presents it to the customer", undermining Plaintiffs work performance by making false corrective actions. Plaintiff contends "Defendants" corrective action is direct evidence of the discriminatory actions asserted in all of her claims.

"Defendants" conspired to make false negative performance reviews as it was several training staff that had the authority to make performance reviews and Plaintiff was led to believe all of them gave negative performance reviews. The actions of "Defendants" changed the condition of Plaintiffs employment by "Defendants" repeatedly scrutinizing her work namely her word choice, scrutinizing her taking detailed notes, including but not limited to harassment, retaliation, intimidation, creating an unpleasant work environment making it extremely difficult for Plaintiff to perform her job.

Plaintiff contends she did not expect the treatment during the training for the promoted position (position in dispute) to escalate once she successfully made it through the training period, as the prejudiced treatment during her first training period for the

contractor position did not escalate after her first training period ended. Also, she would not be subjected to the same training staff directly, and or on the same terms, and conditions. "Additionally, a hostile or abusive work environment claim is actionable under Title VII". ***Meritor Sav. Bank, FSB v. Vinson,*** 477 U.S. 57, 66-67, 73 (1986).

"Defendants" acted within the authority of the State of Texas it's laws, rules, policies, and or regulations to commit the actions complained of herein ie., terminate Plaintiff's employment at will, while denying Plaintiff a promotion, while imparting ridicule, and insults, when addressing the way Plaintiff talks, her choice of words, paired with writing disciplinary actions against Plaintiff for the way she talks, her choice of words, these actions were offensive to Plaintiff.

Plaintiff invokes her right to due process under the 14th Amendment of the Constitution regarding her discharge, and right to be protected from such actions committed by "Defendants", her right to property, and any and all other rights and protections afforded by the 14th amendment and laws of the land.

Plaintiff is compelled to seek redress as her employment is an undisputable privilege and or right. Plaintiff contends wrong is wrong no matter how the wheels of justice turn. Plaintiff does not have the liberty of retaliating when she is wronged in her employment. Plaintiff only has the recourse of seeking redress in the Court system. Plaintiff went to "Defendants" to ask for relief when she spoke to Defendant Ashley Merrick training supervisor, asking if she could appeal their decisions and the treatment she received while on-the-job training as explained herein, and was denied.

Plaintiff filed a complaint with EEOC, and subsequently she filed a complaint with the courts.

Due to the ongoing discriminatory practices in employment Plaintiff seeks a resolution to the present and future discriminatory acts of her employer. The court system has failed to render any type of relief in this present case. Namely, all the different theories, stages, and categories, of her specific claim.

The court has not determined if any of the actions of "Defendants" violated any of the anti-discriminatory laws, whether "Defendants" actions violated any of the laws, rules, policies of the forum state and or laws of the United States Constitution.

3. **Who**: Defendants ADT LLC namely Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name.

4. **What**: Retaliation. "Defendants" stated Plaintiff "is not able to run her market without continuous help from the training team", "Sonya has made tremendous improvements with her behavior, but she is still behind where she needs to be with the policies, and procedures", "Sonya's previous behaviors impacted her performance to be on pace with the class. With her behavior improvement, she is still behind where she needs to be to perform the RSS role at the pace of her peers".  Please see: Case No. 3:22-cv-02188-D-BN, Dkt 12-2. "Defendants" are clearly comparing Plaintiff to the rest of the training class, and yet "Defendants" are denying any wrongdoing in relation Plaintiffs allegations of any discriminatory treatment, including but not limited to race, age, sex, harassment, hostile work environment, retaliation, and or defamation.

Plaintiff contends it is outrageous for "Defendants" to claim Plaintiffs termination is a legitimate non-discriminatory act, due to reasons given for Plaintiffs termination in their corrective action, to include unprofessional behavior, and lack of performance, when it is generally the nature of customer service to require any one department to reach out to a different department, such as escalations, a supervisor upon customer request and the like,  to get an issue resolved, and at times it requires more additional time than usual or expected. Plaintiff contends "Defendants" reasons given were based on future lack of performance and not the lack of performance during the training class and not the real reason for Plaintiffs termination; a pretext for discrimination in Plaintiffs treatment and termination.

Plaintiff contends in her previous position as scheduler before her promotion, often times she would have to reach out to other departments, including sending emails, dialing other extensions, speaking to management, speaking to Regional Support Specialist coworkers, technicians, sales staff, existing customer department, new customer department, various technical support departments,  a different scheduling department due to the status of a customer's account such as if the customer had an account with a provider that "Defendants" acquired such as Defender, and Brinks, all to get a customer issue resolved.

Plaintiff was able to navigate all of the applications to get all issues resolved in her previous position as scheduler with no incident or problems. Plaintiff often was permitted to work overtime based on her performance and ability to effectively and appropriately handle customer and company issues. "Defendants" reason given that Plaintiff lack of performance and unprofessional behavior is the reason for their actions is unreasonable and inconsistent.

The first duty when you start the Regional Support Specialist shift is to set up your JST, branch, and jeopardy services. The jeopardy services are appointments that are in jeopardy of not being scheduled or addressed. The good morning email acknowledging the area you will be working has to be sent to the service manager for the area you are working, the area manager, the team leads for the area you are working, and the Regional

Support Specialist lead you will be working with. The late on-site email has to be sent, which includes calling the technicians to verify if they will make their appointments on time, notating the ticket that they will be on time, making a report on who is available, on time, and who will be late, and sending that report by email to the manager for that area. Afterwards you send an email to the same management team recipients.

Once the good morning email, and am checks are complete, you work unassigned jobs, and work jobs in jeopardy and emergency services. After these are worked and the first hour of work between 9am and 10am check emails for any work-related information including updates, reminders, any customer related emails regarding services.

Afterwards you notify the appropriate manager/ (SSO) of the unassigned and overbooked service jobs due by 10am. You also have to check to make sure the technicians will be making their next scheduled appointments on time, called am health check due by 10am.

Between 10am and 12pm you continue to work jobs in jeopardy and emergency services which should be completed already ideally when you work them at the beginning of the day. Most times there are not many of these jobs at the beginning of the day, and or they are resolved at the beginning of the day because all of the Regional Support Specialist are responsible for working the same jeopardy jobs and emergency service jobs.

Also, during this time, you make sure all the technicians have a full schedule with no gaps in between jobs, called gap check. You are also required to work your SAPOQ's, scheduled, assigned, pending, open, and unassigned jobs.

The MMB software is where you place a system on test, process the request for payment for the technicians once a job is complete, change a job status using code numbers such as scheduled, open, parts pending, place to priority, place a job to billable, scheduled appointments for service, review a customers account history such as current and past services.

There is a couple of actions the training team tried to make an issue out of when giving instructions called changing a CS#. You have to change the CS# if there is a panel change because you are changing the system type and the system number has to be changed. The training class were more focused on explaining the process rather than including the reasons behind why you are doing what you are doing. It is a lot of information to retain during training, and can be difficult when you are being instructed on what to do, what little reasoning behind why you are doing what you are being instructed to do.

Plaintiff did learn the process, as you have to use MMB and another application, called signal on demand to complete the process of changing a CS#, the trainers added a lot of

hysteria to this job function, likely because the signal on demand application is specific to the Regional Support Specialist role, and because you have to know this job function to complete and close a ticket after a technician has completed the job. There are a number of steps you take in changing a CS# and the trainers were reserved, hesitant, almost reluctant to give instructions for this process.

Some systems were changing from using a landline to cellular communication and that is why changing the system number component is important when the service is done, and because the process of changing the system number is important in order to complete and close the order. The technician messages in on the chat to ask for a CS# number change while he waits, in order to close his ticket. The Regional Support Specialist has to know the different system types and the steps to change one system type to another system type using the steps for the particular application.

Prior to changing a CS# you have to know the system type, whether primary, secondary, standalone, and you can get this information from the technician. The technicians were instrumental in assisting with system type changes regarding what system it is changing from and changing to. The Regional Support Specialist role was to make the change in the MMB application and signal on demand. Plaintiff tried to confirm the accuracy of her notes when performing all tasks, whether she was performing the task correctly.

Plaintiff insisted on taking personal written notes she could refer to in addition to use of an application on the company's computer system, and or a reference guide such as the Shield. Referring to the Shield can take extra time, and delay versus a tangible hard copy note. Also, notes in my own words and steps are most useful.

One other task where tensions seemed to rise was adding a line/retemplating when changing a template. Plaintiff contends review of her performance while in training is necessary to assist with the facts related to Plaintiffs contentions that "Defendants" conspired to deprive Plaintiff of income, employment, to discriminate based on age, race, sex, created a hostile work environment, committed defamation using false performance reviews and false corrective actions, in retaliation for Plaintiff opposing this treatment.

At all times complained of "Defendants" were in complete control over their actions and the outcome regarding Plaintiffs employment status employed or terminated. Plaintiff had no protections against the actions and or treatment from "Defendants".

5. **When**: January 17, 2022 through March 7, 2022, and approximately February 8, 2021 through February 22, 2021.

6. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

7. **Why**: "Defendants" have not answered. Plaintiff contends "Defendants" retaliated against her by terminating her employment because she opposed the corrective actions written against her on March 7, 2022 when training manager Ashley Merrick gave notice that Plaintiff would be terminated. Plaintiff before that opposed not being able to take notes during training, by continuing to take notes and requesting to take notes during training when allowed. Plaintiff had to stop the trainers Latoya Lunan, and Sam McLaughlin to ask if she can not take notes during segments of the training. "Defendants" often expressed their reluctance to allow Plaintiff to take notes during the training, which was suspicious to Plaintiff. Plaintiff was able to learn the material by taking notes, which showed notes were needed.  Plaintiff took notes with most of the trainers depending on what the trainer was going over with Plaintiff. If the different trainer had new or different information Plaintiff would make a note of most of the information, she was given by each of the trainers. Plaintiff subsequently learned enough to perform her job duties as Regional Support Specialist.

8. **Who**: Defendants ADT LLC namely Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name, Kara Marconi, Ashley Rioux, April not sure of last name.

9. **What**: Plaintiff claims wrongful termination.

10. **When**: March 7, 2022.

11. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

12. **Why**: According to "Defendants" job performance is the reason for Plaintiffs termination. "Defendants" stated Plaintiff is unable to perform her job duties and for that reason her employment was being terminated. "Defendants" accused Plaintiff of stealing time while on the schedule, saying Plaintiff "logged back in from payroll saying nothing", "she steps away after EOD is completed and comes back when its time to clock out avoiding review with the mentor". Defendants in their corrective action states behavior as the category and unprofessional behavior as the code. Plaintiff was ultimately terminated on March 7, 2022 after a final written warning on February 28, 2022. Defendants did not give Plaintiff any information regarding her right to appeal, dispute, and or complain about the corrective action, and or the treatment she received.  The information on the corrective action says Plaintiff could call the Employee Assistance Program (EAP). Plaintiff asked Defendants if she could appeal their decision to terminate her employment and Defendants said no. Plaintiff in turn appealed to the EEOC, and afterwards to this court for redress. "Defendants" had to have known that their actions of requiring Plaintiff to train with so many different trainers is discriminatory in that no other trainees with similar issues with the training materials who asked questions about the training were required to train with numerous trainers. "Defendants" knew or should have known that

Plaintiffs opposing their actions is a protected activity. Instead "Defendants" said Plaintiff "gave push back" "when the training team tries to help", and retaliated against Plaintiff. Case No. 3:22-cv-01288-D-BN, Dkt. 12-2 page 3 of 7. "Defendants" determined Plaintiffs opposing their treatment as "push back", when all Plaintiff did was exercise her right to freedom of speech, right to protest, right to be fairly treated, and right to due process. "Defendants" actions in retaliating against Plaintiff for opposing this treatment saying it was unfair, and insisting on taking notes, and trying to retain her employment is the reason Plaintiff was terminated.[7]

13. **Who**: Defendants ADT LLC namely Ashley Merrick training manage, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name

14. **What**: Plaintiff claims a hostile work environment, and or disparate treatment.

15. **When**: January 17, 2022 through March 7, 2022, and approximately February 8, 2021 through February 22, 2021.

16. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

17. **Why**: Defendants have not answered to why the hostile environment, and disparate treatment. When Plaintiff complained to Defendants and asked why she was receiving different treatment than her coworkers during on-the-job training Defendants said they were "only worried about you", Plaintiff. Plaintiff contends the work environment was hostile because "Defendants" singled her out by requiring her to train for an additional 2 days making it look like she needed more time than the rest of the class time to learn her new role. Defendants made it look as if Plaintiff was the only person in the training class that needed additional training in their corrective action, and in the phone conversation Plaintiff had with Defendant Ashley Merrick training manager, "Defendants" made it look like Plaintiff with the additional training could not perform her job duties, which is false.

The other employees on the last day of training said they were still having some problems applying what they had learned, and that they would need additional help. Defendants undermined Plaintiffs work experience in her previous position as scheduler, which was directly related to her newly promoted position Regional Support Specialist. Plaintiff's duties and work experience in her previous role as a scheduler is evidence, she brought something to the table in support of her experience with some of the duties required for

---

[7]Shannon v. BellSouth Telecommunications, Inc., 292 F.3d, 712, 715 (11th Cir, 2002): To establish a casual connection, a plaintiff must show that the protective conduct, and that the protected activity and the adverse actions were not wholly unrelated.

the Regional Support Specialist role. For "Defendants" to say Plaintiff could not perform the duties of Regional Support Specialist, and keep up with the rest of the class performance is false. Plaintiffs previous experience as a scheduler does not appear to be acknowledged by "Defendants" or considered as bringing a range of knowledge and skill that benefited or made a contribution to the job and company.

18. **Who**: Defendants ADT LLC namely Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name, April not sure of last name, Ashley Rioux,

19. **What**: Race Discrimination.

20. **When**: January 17, 2022 through March 7, 2022, and approximately February 8, 2021 through February 22, 2021.

21. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

22. **Why**: Defendants have not answered. Plaintiff contends that her race is the reason she was terminated. Plaintiff is the only person of color that was terminated during on-the-job training. Plaintiff contends that during on-the-job training she was the only person of color that did not have a subservient characteristic or personality as she did not agree with Defendants treatment of singling her out, and opposed Defendants treatment of singling her out.

Plaintiff did not gain the favor of Defendants during training. Plaintiff did not agree with the Defendants not allowing her to take notes during training thus singling her out. Plaintiff expressed her disagreement to not taking notes by asking to take notes when Defendants gave instructions, thus singling her out. Plaintiff did not agree with the Defendants making false negative performance reviews, thus singling her out.

All things considered the only inference to be made by Plaintiff is she was singled out because of her race. Defendants did not treat any of the white employees in the training class with ridicule, and or belittlement thus singling her out. Defendants made it look like they were doing Plaintiff a favor by singling Plaintiff out and extending her training by two days, when other training employees had same or similar questions during training as Plaintiff and did not receive an additional two days to train, were not terminated due to performance, and did not receive corrective actions regarding performance, thus singling Plaintiff out. The ordinary and customary thing to do would be to allow Plaintiff the same opportunity at performing the job duties after training, as the other employees in the training class. "Defendants" did not do this.

23. **Who**: Defendants ADT LLC, namely Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name.

24. **What**: Age Discrimination.

25. **When**: January 17, 2022 through March 7, 2022, and approximately February 8, 2021 through February 22, 2021.

26. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

27. **Why**: Defendants have not answered. Plaintiff contends because of her age Defendants maliciously, intentionally, individually, and collectively terminated her employment, treated her with hostility because of her age, and singled her out because of her age. Plaintiff was the only person of color over the age of 40 that was terminated during on-the-job training. There were at least two white females over the age of 40, and one white male over the age of 40 in the training class that were not terminated. These three white employees all had more questions at the end of the training than Plaintiff had but Plaintiff was the only employee terminated.

28. **Who**: Defendants ADT LLC namely Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name.

29. **What**: Sex Discrimination.

30. **When**: January 17, 2022 through March 7, 2022, and approximately February 8, 2021 through February 22, 2021.

31. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

32. **Why**: "Defendants" allowed employees Bruce Roepke, Josh Harvey and Joshua Harstick, all white males remain employed after the on-the-job training. All of these males according to the conversations in the chat had some experience in technical support, and or some background in working with the technicians directly. All of these same white male employees had the same and or similar questions throughout the training class as Plaintiff.

"Defendants" portrayed these white male employees as having more of the needed professional skills to remain employed because of their technical skills by treating them

more favorably than Plaintiff. These male employees with their technical skills had the same or similar questions as Plaintiff during training and struggled with the training materials. Plaintiffs previous experience prior to her promotion in her role as scheduler involved the same tasks and experience required to effectively work and manage the Regional Support Specialist role, the same as the male employees had previous experience in positions held prior to their promotions. Plaintiff was deemed unable to perform her job duties, these male employees were promoted and Plaintiff was not promoted. Plaintiff contends she was not promoted because she is female, and in retaliation for opposing "Defendants" treatment during the training process. Plaintiff, opposed "Defendants" evaluating her skills on a higher scale than the male employees in training. "Defendants" made it clear that Plaintiff skills were being compared to the rest of the training class in their corrective action. Please see Dkt.

33. **Who**: Defendants ADT LLC, namely Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name.

34. **What**: Emotional Distress, denial of Plaintiffs free speech rights.

35. **When**: January 17, 2022 through March 7, 2022, and approximately February 8, 2021 through February 22, 2021.

36. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

37. **Why**: Defendants have not answered. Plaintiff contends her termination and treatment from "Defendants" during her training periods and since has caused her harm. Defendants denying Plaintiff a right to free speech during her training periods is unacceptable, and in violation of Plaintiffs first amendment rights.

38. **Who**: Defendants ADT LLC, namely Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name.

39. **What**: Plaintiff claims retaliation and infringement upon her right to free speech.

40. **When**: January 17, 2022 through March 7, 2022, and approximately February 8, 2021 through February 22, 2021.

41. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

42. **Why**: "Defendants" retaliated against Plaintiff by restricting her from speaking during training. "Defendant" Samuel McLauglin said to Plaintiff to not worry about anything to just do as he said, in response to Plaintiff asking questions about a job duty, during his one- on- one training with Plaintiff. Several of the "Defendants" were adamant about silencing Plaintiff during the on-the-job training responding that Plaintiff was asking too many questions. "Defendants" had to know that silencing someone during training is abusive.

43. **Who**: Defendants ADT LLC, namely Ashley Merrick training manager, Samuell McLaughlin trainer, Latoya Lunan trainer, Bryan Brown HR personnel, Phil trainer, not sure of the last name.

44. **What**: Harm

45. **When**: January 17, 2022 through March 7, 2022, and approximately February 8, 2021 through February 22, 2021.

46. **Where**: Dallas, County Texas, where Plaintiff was employed remotely by "Defendants".

47. **Why**: "Defendants" have not answered. Plaintiff contends "Defendants" actions caused her financial damage. Plaintiff lost her 401k, health insurance coverage, lost financial support to prepare for retirement, affected financial ability to provide burial insurance, affected ability to provide for family financially, caused more wear and tear on vehicle due to travel requirement to current position.

"Defendants" actions are more than isolated incidents of abuse. Defendants denied Plaintiff her promotion, denied Plaintiff employment, thus depriving Plaintiff of her civil liberties, a right to liberty, property, and the pursuit of happiness against the 14th amendment due process clause.

Plaintiff lost her professional ability to grow as an employee within the company and abroad, as the Regional Support Specialist was a position that did not demand a high volume of direct contact with the customer. The position had a combination of contact with fellow employees as well as contact with customers. The position would have built on Plaintiffs interactive leadership, managerial, and team support skills with a title attached to it. Many of the Regional Support Specialists go on to being team leads, trainers, and managers.

The Regional Support Specialist is a type position in high demand due to the required duties, remote work from home opportunity,

The position was a remote work at home position Plaintiff had previously worked for more than twelve months. Plaintiff has not since gained a remote work at home position as they are not readily available. Plaintiff does have issues gaining employment due to her background.

Plaintiff suffers with a surge of anxiety since her termination, and her anxiety suffering has increased due to the damage caused by the treatment from "Defendants" terminating her employment, and the process of litigation.

Plaintiff suffers from a loss of enjoyment of life, emotional stress, emotional pain and suffering due to her loss of employment. Plaintiff's loss of employment in her remote work at home position has caused anxiety and fear of her safety due to the stress and woes of commuting to work, including but not limited to car accidents, loss of limb or life during travel, road rage, and has caused a need for her to take medication due to the increase in stress and anxiety from her termination, and litigation.

### III. Plaintiffs Supplemental Restatement of Claims

1. Plaintiff was employed by "Defendants" as a contractor from February 16, 2021 through December 17, 2021 and as a permanent employee from December 17, 2021 through March 7, 2022. Plaintiff was singled out during training for a promoted position from January 17, 2022 through March 7, 2022. "Defendants" singled out Plaintiff by causing her to train for an additional two (2) days, as no other trainees were required to train an additional two (2) days. Plaintiff was singled out by receiving disciplinary action during training. No other trainees received disciplinary action during training per "Defendants" training manager they are "only worried about you" (Plaintiff).

2. Plaintiff questioned the training manager Ashley Merrick about her (Plaintiff) receiving negative reviews during training including but not limited to disciplinary action, and termination when other training employees had the same and or similar issues during training, issues learning and questioning the training material, and they did not receive disciplinary action, negative performance reviews, and/or termination.

3. "Defendants" training manager Ashley Merrick replied "We are only worried about you". Please see, *Exhibit* 1 audio starting at 18:25 minutes and seconds through 12:34 and beyond of "Defendant" Ashley Merrick comments.

4. Plaintiff was led by "Defendants" to believe she was the only trainee during Plaintiff's training class receiving this treatment ie., corrective action, termination, negative performance reviews, and being required to train for an additional two (2) days, during training.

5. Plaintiff inquired about the employees in her training class receiving the same treatment as she, such as termination, and negative performance reviews etc. Training manager Ashley Merrick stated they go through the process very often. Please see *Exhibit* 1 audio starting at 18:25 minutes and seconds through 12:34 and beyond of "Defendant" Ashley Merrick comments.

6. "Defendants" reason given for terminating Plaintiff because she continued to reach out for assistance during training is false due to their own policies, and procedures of having to refer to the Shield to resolve issues, and the requirement to reach out to team leads, and other members of her department such as management for assistance when necessary to respond and resolve customer issues. Referring to the Shield, team leads, and to management is a day-to-day normal practice in the department Plaintiff was assigned to and other departments as well.

7. Plaintiff work experience, there with "Defendants" and her work experience prior to and after her employment with "Defendants", is adequate and have requirements on a day- to-day basis to reach out to management for certain issues and is normal practice.

8. "Defendants" terminated Plaintiff during training saying she was unable to perform her job duties. "Defendants" wrote disciplinary statements saying Plaintiff was not able to perform her job duties without the assistance of the training staff.

9. "Defendants" made no mention when asked by Plaintiff why Plaintiff was being singled out with disciplinary actions, negative performance reviews, and termination in comparison to all the other training class employees in her training class. "Defendants" stated they were only worried about Plaintiff. Please see *Exhibit* 1 audio starting at 10:14 minutes and seconds through 12:34 and beyond of "Defendant" Ashley Merrick comments. "Defendants" response is suspect and Plaintiff believes it is because "Defendants" were prejudicial, indifferent, and that their conduct is violative of the retaliation and discriminatory laws.

10. "Defendants" stated in their conversation between Ashley Merrick training supervisor and Plaintiff, "we have a lot of documentation regarding issues with Plaintiffs work performance", but did not make this documentation known to Plaintiff. Plaintiff was not aware her work performance reviews were not acceptable during training deserving termination. Plaintiff was told she was invited to the graduation of the training. Plaintiff was approached by "Defendants" Ashley Merrick about her behavior first, leading Plaintiff to believe she could address her behavior and proceed with the training process, which she was allowed to proceed through the training process. The corrective action and performance reviews are two separate reviews. Defendants corrective action, and reasons for their corrective actions are inconsistent and contradictory, to their reason for Plaintiffs termination. Defendants corrective action states Plaintiff had behavioral issues, that

Plaintiff "made tremendous improvements with her behavior", "but still behind with the policies and procedures". All things said, even if "Defendants" have a right to terminate Plaintiffs employment at will, "Defendants" actions of falsely accusing Plaintiff of stealing time, making false performance reviews, singling Plaintiff out during training by not allowing her to take notes, singling her out saying she is unable to perform her job duties when she performed as well as any of the other employees prior to and during the training class is questionable.

11. Plaintiff asks the court for a chance to submit testimony and or documentation on her behalf that she did have a history of good performance while working for "Defendants", including addressing "Defendants" statements in their corrective actions, so that Plaintiff has a chance to review the documentation "Defendants" said they have regarding Plaintiffs poor performance.

12. Plaintiff's performance is one reason "Defendants" gave for Plaintiffs termination, and one of the reasons Plaintiff has filed a claim of discrimination. "Defendants" poor performance evaluation is one of the reason's Plaintiff filed a claim of discrimination. Plaintiff went from acceptable, and or good reviews prior to her promotion, to outstanding behavioral, professional issues in employment. "Defendants" claims are false.

13. "Defendants" have a screening process that includes an assessment during the application process prior to their making an offer of employment. "Defendants" are fully aware of their requirements for employment, including but not limited to the applicant being suitable and have the necessary skill and qualifications.

14. Plaintiff's employment was greatly affected when Sam McLaughlin delayed Plaintiffs training demanding that she not take notes during training and demanding she use his notes instead.

15. Plaintiff asked if there was an appeal process for her to address her complaints and "Defendants" responded no they do not have a process for complaints and or an appeal process for complaints and or termination complaint process. Please see *Exhibit* 1 audio at 21:20 minutes and seconds of "Defendant" Ashley Merrick audio comments through 21:40 minutes and seconds.

16. "Defendants" gave behavior as a reason for Plaintiffs termination during a recorded audio taken by Plaintiff, at the same time saying Plaintiff did not have the necessary behaviors from day one. Please see *Exhibit* 1 audio of "Defendant" Ashley Merrick Please see *Exhibit* 1 audio at 22:20 minutes and seconds of "Defendant" Ashley Merrick audio comments.

17. "Defendants" in their corrective action dated February 28, 2022 gave performance as the reason for Plaintiffs termination. These two reasons given are inconsistent with "Defendants" own written corrective actions dated February 28, 2022 stating Plaintiff's behavior had improved, but her performance was behind. The category of the corrective action is behavior and the code is unprofessional behavior. Please see *Exhibit 2*. "Defendants" did more than exercise their right to terminate Plaintiffs employment. "defendants" retaliated against Plaintiff when she opposed their treatment, and on several occasions, Plaintiff asked Samuel McLaughlin, Latoya Lunan, if she could be allowed to take notes.

18. Plaintiff in her recorded conversation stated or complained she was the only person in training being written up during training and "Defendants" stated Plaintiff was not alone, and that writing up a person in training is something they do very often "Defendants" Ashley Merrick training supervisor. Please see *Exhibit* 1 audio at 18:20 minutes and seconds of "Defendant" Ashley Merrick audio comments.

19. Plaintiff went to EEOC and EEOC did not investigate Plaintiffs complaints. Plaintiff is left with no other recourse but to seek relief from the court.

## Discussion

20. It is common and normal practice in any employment setting, and or society not to know every aspect of a given situation and have to refer to a manual, point of contact, etcetera. The same in being employed by "Defendants", the Shield is a reference guide all employees had to refer to for numerous guidelines on how to resolve an issue. Plaintiff contends "Defendants" corrective action, and negative performance reviews, were an excuse to terminate her employment due to her opposing their hostile treatment while she was employed, and during training and not the real/ true reason given by "Defendants".

What could have been the purpose of "Defendants" not allowing Plaintiff to take notes during the training, when "Defendant" Samuel McLaughlin said to Plaintiff to use and refer to his notes instead of using her own notes, and when she tried referring to her own note's he made an issue out of her using her own notes as to infer Plaintiffs notes were an issue. Plaintiff did manage to take some notes, the training team frowned on Plaintiff for taking notes, and interfered with Plaintiff taking notes using her own paper. "Defendants" insisted Plaintiff take notes using their computer application.

Plaintiff contends she made a detailed account of the steps to be performed as she encountered them, and to be used as references for each of the problem's she had with the specific job duty. Plaintiff had to use the Defendants software to make notes and was not allowed to make notes on her own papers without it being an issue or problem.

Plaintiff contends on days of the training when we were not working on the phone and with customers and handling customers personal information "Defendants" did not allow note taking on our personal documents. There was little to no interaction with the customers directly during training. Throughout the entire 6-8 week training, Plaintiff spoke with maybe 5-10 customers at the most. The training staff insisted we take notes using the "Defendants" software. Not being able to refer to notes, is a concern when your production counts against you on your performance reviews.

There is a lot more to the aspects of Plaintiffs job position than can be brought up during the pleading stage. Plaintiff is aware for security purposes regarding the protection of customer's accounts and personal information we are not allowed to make notes. Plaintiff contends during segments of the training when the processes to be performed that did not involve customer personal information where she was discouraged, shunned, exaggerated, and charade upon for taking notes.

This demand caused some delay in the training process because Plaintiff could only go over the material during training, and "Defendants" controlled when Plaintiff could and could not review her notes. Plaintiff contends she felt inhibited and abuse.

21. Because "Defendants" gave a false statement as the reason she was terminated Plaintiff contends this is a matter for the court to resolve the truth and or facts related to "Defendants" reason for their disciplinary statement and actions terminating Plaintiffs employment.

22. Plaintiff contends the promotion was not a handout, and that she got nothing for something. "Defendants" knew or should have known the employment issues people of color face in being hired, terminated, and discriminated against in employment.

23. "Defendants" being an employer having to investigate future employee's backgrounds for criminal activity, having to refuse employment to applicants with criminal backgrounds that do not meet the requirements, and or criteria for employment based on their criminal background reports are aware that criminal backgrounds can negatively affect an applicant's chances for gaining employment, and that terminating her employment would negatively affect her lively hood, including but not limited to finances due to her background.

24. "Defendants" knew or should have known Plaintiffs background and qualification status at the time of her termination.  "Defendants" knew or should have known that Plaintiffs termination could be a negative impact on Plaintiff, and could have the effect of unequal influence due to Plaintiffs background.

25. "Defendants" termination of Plaintiffs employment did not affect her receiving unemployment. Plaintiff contends Texas Workforce Commission granted Plaintiff unemployment saying the "Defendants" did not respond to Plaintiffs complaint and request for unemployment benefits, just as they have not responded to the issues in this civil complaint Plaintiff has filed. Plaintiff contends "Defendants" refusal to respond to the allegations is suspect and shows their refusal to take responsibility for their actions.

26. "Defendants" should be educated and knowledgeable in the anti-discrimination, anti-retaliation laws, and have options, and or a plan to limit and correct such actions that violate these laws. Plaintiff contends it is a normal practice to allow an employee the opportunity to train for a position, to work in that position for a period before determining what issues the employee has with performance and then to work with that employee to ensure they have the skills to correct their performance issues. This often includes additional training, and reviews. Performance reviews are conducted daily and weekly by "Defendants".

27. Plaintiff contends even if Defendants claim sovereign immunity which they have not, they cannot not avoid liability when their acts are intentional because malice is part of every intentional tort. The Federal Tort Claims Act (FTCA) provides for relief from injury by government agents. Plaintiff contends that "Defendants" individually, in whole, and or in part acted under the color of state law as a state actor being an employer in the State of Texas, who received benefits from contracts to do business in the state of Texas, and or because the receive benefits such as tax incentives for doing business in the state of Texas. Plaintiff contends when an employer asserts their right to terminate at will they are acting on the laws, rules, policies of that state in which they assert that right and for that purpose they are a citizen of that state.

28. Plaintiff alleges defamation libel and slander. Slander is an intentional tort, malice is implied.

29. Plaintiff contends she is being required to amend her complaint showing facts… when the "federal pleading rules call for a short and plain statement of the claim showing that the pleader is entitled to relief", they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted".[8]

---

[8] *Johnson v. City of Shelby, 574 U.S. 10, 11, 135 S.ct. 346, (2014),* Interpreting Rule 8(a) of the F.R.C.P., the Fifth Circuit has explained: The complaint (1) on its face (2) must contain enough factual matter (taken as true) (3) to raise a reasonable hope or expectation (4) that discovery will reveal relevant evidence of each element of a claim. "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]." *Lormand v. U.S. Unwired.,* 565 F.3d 228, 257 (5ᵗʰ Cir. 2009) (quoting **Bell Atl. Corp. v. Twombly**, 550 U.S. 544, 556, 127 S. Ct. 1955, 1965 (2007)). Applying the above case law the W.D. of

## IV.  Claim for Relief

1.  ADEA says it is unlawful to discriminate because of age with respect to terms of employment, privilege of employment including training, hiring, firing, promotion, and job assignments. It is unlawful to retaliate because of opposing employer practices. https://www.eeoc.gov/laws/guidance/enforcement-guidance-oconnor-v-consolidated-coin-caterers-

2.  "Opposition can be protected even if it does not include words… as long as the circumstances show the individual is conveying resistance to a perceived potential EEO violation".  https://www.eeoc.gov/retaliation

## Liability

### Duty to Prevent

   **1.**  ADT LLC ("Defendants") have a duty to prevent discriminatory actions to Plaintiff.

   **2.**  Plaintiff and "Defendants" had an employer- employee relationship.

   **3.**  "Defendants" failed to prevent harm to Plaintiff from discrimination and harassment for opposing discriminatory actions committed by "Defendants".

   **4.**  "Defendants" breached that duty by failing to prevent discrimination and harassment to Plaintiff.

---

Louisiana has stated: Therefore, while the court is not to give the "assumption of truth" to conclusions, factual allegations remain so entitled. Once those factual allegations are identified, drawing on the court's judicial experience and common sense, the analysis is whether those facts, which need not be detailed or specific, allow "the court to draw the *reasonable* inference that the defendant is liable for the misconduct alleged." [***Ashcroft v. Iqbal***, 556 U.S. 663, 678, 129 S. Ct. 1937, 1949 (2009)]; ***Twombly, 55[O]*** U.S. at 556, 127 S.Ct. at 1965. This analysis is not substantively different from that set forth in ***Lormand, supra,*** nor does this jurisprudence foreclose the option that discovery must be undertaken in order to raise relevant information to support an element of the claim. The standard, under the specific language of F.R.C.P. 8 (a)(2), remains that the defendant be given adequate notice of the claim and the grounds upon which it is based. The standard is met by the "reasonable inference" the court must make that, with or without discovery the facts set forth a plausible claim for relief under a particular theory of law provided that there is a "reasonable expectation" that "discovery will reveal relevant evidence of each element of the claim". **Lormand,** 565 F.3d at 257; ***Twombly, 55[O]*** U.S. at 556, 127 S.Ct. at 1965.

5. "Defendants" directly and or indirectly caused harm to Plaintiff by discharging her because she opposed their discriminatory treatment.

6. "Defendants" actions wholly and or in part affected the terms, conditions, and privileges of Plaintiffs employment.

7. At all times complained of in this complaint, Plaintiff had a right to be treated by "Defendants" the same as similarly situated white employees.

8. "Defendants" knew or should have known the actions described herein were wrongful, and seen as discriminative and retaliatory.

9. "Defendants" knew or should have known the law regarding preventing discriminatory and retaliatory acts.

10. "Defendants" failed to train, and or supervise their supervisors, managers, human resource agents in order to prevent the actions described herein, and complained of by Plaintiff.

11. "Defendants" failed to supervise the managers, training team, and supervisors complained of in this complaint to prevent harassment in their workplace.

12. "Defendants" are required to have posted and follow the laws regarding discrimination.

13. "Defendants" breach and or failure to prevent harm to Plaintiff because of her race is the direct and or proximate cause of Plaintiffs injuries.

14. Plaintiff did not have the option to make a written complaint, because "Defendants' did not have a policy for written complaints.

15. Plaintiff asked "Defendants" Ashley Merrick on March 7, 2022, if there was an appeal process for her discharge from employment, and "Defendants" denied having an appeals process for terminations.

## Damages/Intentional Harm

16. Plaintiff was harmed by her loss of employment.

17. Loss of employment caused emotional distress, loss if income, loss of consortium, and loss of enjoyment of life.

18. Plaintiff during her tenure managed to refrain from her nicotine use, and the day of her termination started using nicotine again from the stress of her discharge.

19. Plaintiff started using nicotine again due to the stress of diligently working for the promotion "Defendants" maliciously, wrongfully took from her.

20. "Defendants" acted with intent to harm Plaintiff in terminating her employment, causing emotional distress.

**21.** Plaintiff's emotional distress is continuous and ongoing.

**22.** Plaintiff was intentionally targeted by Defendants to commit their acts of discrimination and prejudicial treatment.

**23.** "Defendants" are responsible for hiring the supervisors, managers, and Human Resource agents who acted with malice and intent to deprive Plaintiff of due process.

**24.** "Defendants" made a false inference that Plaintiff stole time in their disciplinary action terminating Plaintiffs employment.

**25.** Plaintiff professional reputation was harmed with their statement Plaintiff would not begin work while on the clock.

**26.** "Defendants" false statement that Plaintiff would not begin work on time insinuates Plaintiff was stealing time and is defamatory.

**27.** "Defendants" comments made using their written corrective action is false causing libel and slander.

**28.** "Defendants" reason for terminating Plaintiff (unable to perform duties) is shady, questionable, and suspicious.

**29.** Plaintiff was terminated for opposing "Defendants" treatment.

**30.** "Defendants" retaliated against Plaintiff for opposing their treatment.

**31.** "Defendants" intentionally, maliciously oppressed Plaintiff as their actions complained of herein are foreseeable oppressive and intentional.

**32.** Plaintiff harm caused is due to "Defendants" actual malice and intent to harm Plaintiff.

**33.** It is "Defendants" fault Plaintiff suffered collaborative simultaneous injury at all times as described herein.

**34.** "Defendants" negligence either collaboratively or independently is the proximate cause of Plaintiffs injuries.

**35.** "Defendants" were hostile towards Plaintiff by conspiring to deprive her of her promotion in making false disciplinary statements, thus damaging her performance review.

**36.** There were multiple "Defendants" that took part in the making of false performance issues, namely Sam McLaughlin, Ashley Merrick, Kayla Schultz, and Ashley Rioux, Phil, and Latoya Lugan.

**37.** The team of "Defendants" conspired together to deprive Plaintiff of her promotion, and her employment.

38. Plaintiff claimed damages in her Offer of Settlement dated April 27,2023 to "Defendants" for an actual amount of $35,000 for pain and suffering, the approximated damages for one (1) year of wages at $16.70 per hour for 40- hour work week in the amount of $34,736, and an amount of $16, 610 for 3 years of vehicle maintenance to include repairs, fuel, and depreciation totaling $86,346.00.

39. Plaintiff asks for a hearing on the amount of damages as Plaintiff continues to suffer emotional distress, due to the loss of income, loss of retirement benefits, loss of medical benefits, the effects of the loss of her income affecting her future earnings, mental anguish, loss of consortium, loss of enjoyment of life, and harm caused by litigating her claim pro se. Plaintiff has been harmed by time off from work while litigating her claim pro se. Plaintiff has lost many hours from her every day life litigating her claim, taking time from her family life. Plaintiff has been harmed by undue stress in litigating her claim which has caused Plaintiff to be withdrawn from her family.

40. This amount of damages sought does not exceed the maximum limits of the Tex. R. Civ. P. 47(c)(1-4) Claims for Relief.

## Plaintiff's Employment

41. Plaintiff began her employment with "Defendants" January 2021.

42. "Defendants" promoted Plaintiff in January 2022 because of her good performance evaluations. (Please see exhibits 3 and 4).

43. Plaintiff received compliments and positive appraisals from team members. (See Docket No.5 ID 28, Case No. Case 3:22-cv-02188-D-BN)

44. Plaintiff had positive reviews from fellow co-workers and no complaints about her performance from management.

45. "Defendants" did not give Plaintiff negative performance reviews prior to her opposing discriminatory actions approximately early February, through early March 2022 when the negative performance reviews started.

46. Plaintiff continued to perform satisfactorily, and remained employed even though "Defendants" continued to write negative performance reviews early February, through early March 2022.

## Pretext and or Mixed Motive

47. Plaintiff contends she has the necessary skill and experience for the Regional Support Specialist role as she is a college graduate with more than 10 years in customer service including phone and in person customer service skills. Plaintiff contends she

worked for Defendants ADT LLC in the Field Operations Support Center (FOSC) as a scheduler for (12) twelve months prior to accepting the role of Regional Support Specialist.

48. Plaintiff contends she scheduled technicians for jobs in her scheduling role performing the same tasks as the *Regional Support Specialist'* such using the technicians schedule to find available appointments according to the skill level of technicians available, networking with *Regional Support Specialist'* to find sooner appointments, and to move appointments, when possible, to schedule sooner service appointments for missed appointments and or sooner appointment time requests.

49. Plaintiff in her scheduling position took initiative to learn some of the duties of the *Regional Support Specialist* role to better facilitate her role as a scheduler as some appointments would be overbooked, under-booked meaning not scheduled at all and was a main complaint of customers.

50. Plaintiff contends by networking with the *Regional Support Specialists* prior to applying for the *Regional Support Specialist* role she was able to learn and practice some of the tasks of the role prior to on-the job training.

51. Plaintiff contends that it was imperative that she learn how to perform some of the *Regional Support Specialist* roles in her current role as scheduler as it helped the process of scheduling much easier to keep down customer complaints and to assist the technicians along the way of keeping the customer happy with their appointments being made and kept on time.

52. Plaintiff did a sufficient job as scheduler as she would take in approximately 70-120 calls per day during an 8- hour shift managing to get all of the customers scheduled for appointments with no corrective actions while she was employed as a scheduler.

53. Plaintiff contends she would often work with the *Regional Support Specialist* because they were the department to go to for manager approval to put a customer as a priority on a technician's schedule including special requests when a customer was missed the previous day and upset that their appointment was missed, these calls would take at a minimum 5-10 minutes sometimes up to 20-30 minutes.

54. Plaintiff contends good customer service such as this is crucial when you have an upset customer that is threatening to take action due to the unfulfilled service appointments and displeased service from a technician and or product issues.

55. Plaintiff contends often times technicians would be on her line in error, as a scheduler we were required to transfer the technicians to the *Regional Support Specialists* for support, but that she would give them department numbers they needed and or transfer them to the correct department instead of transferring them to the *Regional Support Specialist* to have the *Regional Support Specialist* transfer them again and or instruct them that they needed to contact a different department.

56. Technicians would need to order parts, get technical support while in the field, speak with a *Regional Support Specialist* to close their ticket, and I would have to be familiar with the scenario and transfer to the correct department. This was not common knowledge. Plaintiff had to be assertive and learn all the duties of the different departments. Plaintiff took the initiative on her own to learn the different functions of the different departments.

57. Learning the different functions of all the different departments was the hardest part of the position due to the amount of time it took to learn the different departments and their functions while performing my job duties. Transferring to correct departments saved time, and stress for the customer and fellow co-workers.

58. Plaintiff contends she learned the issues the technicians would be calling about and if it was not a confirmation, or a technician work schedule time issue, Plaintiff would assist the technician in getting to the correct department. Plaintiff contends the technicians would give their thanks to Plaintiff for saving them time, giving them the correct information regarding the department they needed to be transferred to, and preventing them from being transferred to a *Regional Support Specialist* when it was a different department they needed.

59. Plaintiff contends the *Regional Support Specialist'* she worked with often thanked Plaintiff for assisting technicians in instances when they did not need a *Regional Support Specialist* and instead got the technician to the correct department. Plaintiff contends it all worked out well, and that team work makes the dream work, and that she did the same in many other aspects of her role as scheduler with other departments such as the sales, and trouble-shooting department.

60. Plaintiff learned what departments the customer needed to be transferred to instead of transferring the customer to the incorrect department to later be transferred to a different department which happened a lot.

61. Plaintiff contends she had to make lots of notes to get the correct information and that it took her months to learn how to better assist the customer as well as her fellow co-workers all while performing her role as scheduler.

62. Plaintiff contends she requested her manager Nicole to do reviews and or mentor her, her handle time, her professionalism while on the line with customers and fellow co-workers including technicians for 3-6 months so that she would receive a high score on her performance reviews.

63. Plaintiff contends she received high scores on her performance reviews at the end of her being mentored by her manager. Plaintiff fears retaliation against former co-workers who did not participate in unlawful employment practices.

64. Plaintiff contends there were 1-2 weekly performance reviews called quality assurance reviews (QA) where the QA team would listen to Plaintiff on a call and grade the call, which the grading was strict. Plaintiff had to greet the technicians, and

all fellow employees appropriately, actively listen to address all their issues, be polite, show empathy, close the call appropriately ask if you can further help, if there is anything else you can do to help, deescalate the issues, handle the call within 4 minutes. Plaintiff contends she had a call intake of 70-120 calls per day consistently to keep up with her quota, including helping fellow co-workers and that she did all she could to keep her position with Defendants ADT LLC. Plaintiff contends her first week in her position of scheduler she had an intake of 30 plus calls consistently and each week the calls increased with greater experience and skill as she learned her role, including assisting in other aspects of her role with fellow co-workers, and assisting with customer issues that were not part of her role as scheduler, such as sales, upgrades, trouble-shooting, part requests, requests to speak to service supervisors.

65. Plaintiff contends she did more than expected to be an ideal employee in her position, to be most professional, and supportive to the customer as well as fellow employees.

66. Plaintiff contends she had to learn the different aspects of the sales department because one part of sales was for upgrades, one part was for new customers, one department was for existing customers, one sales department did not take calls from customers, and Plaintiff had to through trial and error and from a list of complaints from customers that they had been transferred to the incorrect department, and from fellow co-workers that there were many different aspects of each department to learn the correct department depending on the customer's issue.

67. Plaintiff contends it took a lot of hard work and dedication to Plaintiffs employment position as a scheduler, and commitment to her employer Defendants ADT LLC, to fellow co-workers and to the customer to satisfy many of the requirements for good customer service in her role as scheduler.

68. Plaintiff contends her level of professionalism as required by Defendants ADT LLC improved while being mentored by her manager Nicole, and her manager was familiar with Plaintiffs work ethics and her manager did agree that Plaintiff had reached a level of work ethic and professionalism to apply for the *Regional Support Specialist* role. Plaintiff contends it is required that you get approval from your manager to apply for a different role after you have been in your current role for 6 to 12 months.

69. Plaintiff contends she had only a verbal consultation with her mentor regarding any incidents of how she handled a call and no written corrective actions of any kind in her role as scheduler.

## Prejudice Behaviors

70. (B) On a claim in which an individual proves a violation under section 2000e-2(m) of this title *[section 703(m)]* and a respondent demonstrates that the respondent would

have taken the same action in the absence of the impermissible motivating factor, the court-

71. (i) may grant declaratory relief, injunctive relief (except as provided in clause (ii)), and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m) of this title *[section 703(m)]*; and

72. Plaintiff was evaluated based on her perceived personal characteristics which was prejudicial, as "Defendants" notated in their corrective action that Plaintiff "tone – "Whatchu you thing you need" when addressing a technician is inappropriate.

73.  A person's language is considered a personal characteristic, and "Defendants" actions toward Plaintiff based on her language, and or use of is prejudicial, as they were perceived personal characteristics.

74. Prejudice can refer to unfounded pigeonholed beliefs and it may apply to "any unreasonable attitude that is unusually resistant to rational influence"[i]

## Discrimination/Racial Hostility/Hostile Environment/Racial Harassment

75. "Defendants" falsely created performance issues on February 10, 2022, February 22, 2022, and February 28, 2022 to aid Plaintiffs termination.

76. "Defendants" intentionally, maliciously, and falsely created performance issues because of Plaintiffs race (African American).

77. Had Plaintiff not been African American "Defendants" would not have created the false performance issues.

78. The written statement (corrective action) made by "Defendants" on February 10, 2022 infer racially inferior characteristics, and suggest Plaintiffs attitude, manner, and or nature is violative and or defiant.

79. "Defendants" namely Ashley Merrick training supervisor who is white, sabotaged Plaintiffs good performance evaluations by creating bad performance issues.

80. "Defendants" did not assess Plaintiff the same as her fellow co-workers.

81. Plaintiff performance was as good or better than that of her co-workers.

82. Plaintiff began at entry level and graduated to a skill level of Expert in her position.

83. "Defendants" activities of belittling, humiliating, and scorning Plaintiff led to her termination.

84. It was "Defendants" prejudiced act of placing Plaintiff in a "socially-formed category" ie., race (African American) that aided in Plaintiffs discriminatory treatment.[ii]

85. "Defendants" continued to switch trainers during on-the-job training.

86. "Defendants" conspired to deprive Plaintiff of her promotion and employment.

87. "Defendants" namely trainer Samuel McLaughlin who is white, deceitfully told Plaintiff he would "not let her fail" the on-the-job training.

88. "Defendants" namely trainer Samuel McLaughlin who is white, would repeatedly say "ciao" to Plaintiff two days before Plaintiff was terminated. (Please see Exhibit 5)

89. "Defendants" on more than one occasion during training refused to communicate to Plaintiff, which inhibited Plaintiffs ability to work.

90. "Defendants" actions altered a term, condition, or privilege of Plaintiff's employment.

91. "Defendants" intentionally made Plaintiff's performance inadequate.

92. But for Plaintiffs race African American (black) Plaintiff would have received equal evaluations the same as my peers regarding performance evaluations, and disciplinary action.

93. "Defendants" refuse to correct their discriminatory actions.[iii]

94. "Defendants" refused retraining to Plaintiff while letting other similarly situated white employees to participate in the training program.

95. "Defendants" refused on numerous occasions to train Plaintiff for her new position.

96. Plaintiff was unreasonably excluded from the training, apprenticeship, and or retraining program.

## Termination of Plaintiffs Employment

97. Plaintiff was terminated due to the bad performance issues created by "Defendants" namely Ashley Merrick, training supervisor who is white.

98. "Defendants" did not follow their own code of conduct policies.

99. Plaintiff filed a timely discrimination complaint with EEOC on March 7, 2022 the day of her termination and the complaint was officially filed 8-30-2022, charge no. 510-2022-03700.

100.    EEOC issued a right to sue letter 9-1-2022.

101.    "Defendants" treated Plaintiff like this because she is African American (black).

102.    But for Plaintiff's race African American (black), she would not have been terminated.

103.    Plaintiff would not have been subjected to the abundance of hostility from Defendants if she were not African American (black) but for her race.

104.    The National Labor Relations Board found that "Defendants" wrongfully used disciplinary actions to wrongfully discharge an employee in the past.[iv]

**105.**    Plaintiff was forced to train with multiple trainers, Samuel McLaughlin who is white, Latoya Lunan who is black, Kara Marcon who is white, and Ashley Rioux, who is white.

**106.**    Defendants harsh, unwarranted, prejudice treatment is the cause and or proximate cause of Plaintiffs injury.

## Failure to Investigate Plaintiffs Complaints

**107.**    Plaintiff complained of "Defendants" bogus performance reviews and "Defendants" retaliated against Plaintiff by terminating her employment.

**108.**    Plaintiff complained directly to the training staff Samuel McLaughlin, Latoya Lunan, Kara Marconi, and Nicole Kennedy, of her desire to overcome the barriers that were discriminatorily placed before her.

**109.**    "Discrimination within the meaning of Title VII of the Civil Rights Act of 1964 can take many forms" [v]

**110.**    Plaintiff and "Defendants" made an agreement implied, express or otherwise that a contractual obligation would be fulfilled.

**111.**    "Defendants" in their offer of employment to Plaintiff presented a written statement, and or policy that discrimination is prohibited in their workplace.

**112.**    "Defendants" failed to prevent discrimination in their workplace.

**113.**    After inquiring about formal grievance procedures "Defendants" failed to provide any options to formally grieve her account of "Defendants" actions.

**114.**    Plaintiff was intentionally excluded from her employment opportunity to be promoted.

**115.**    "Defendants" technician employees have a union, and "Defendants" are familiar with or should be familiar with discrimination laws, yet "Defendants" repeatedly violate their own policies as well as laws against discrimination.

**116.**    Plaintiff is not the only person to have complained about discrimination and retaliation.[vi]

**117.**    "Defendants" HR manager who is white, the operations manager in the department where Plaintiff was hired who is white, along with the training team all conspired to deny Plaintiff her promotion.

**118.**    The management team knew of the discriminatory actions taken by the training team, and did nothing about it.

**119.** The management team did not prevent the actions committed by the training team.

**120.** "Defendants" have a history of retaliating against employees for opposing their discriminatory behavior.[vii]

**121.** Many other current and former employees have complained of "Defendants" discrimination and retaliation.

**122.** "Defendants" failed to investigate Plaintiffs complaint regarding their bogus performance review and termination.

**123.** "Defendants" failed to acknowledge Plaintiffs complaint and or their actions toward Plaintiff as wrongful.

**124.** Many other current and former employees have complained of "Defendants" discrimination and retaliation.

**125.** "Defendants" Ashley Merrick, Samuel McLaughlin, Latoya Lunan, Kara Marconi, all made statements that they were acting within the scope of their employment.

**126.** "Defendant" Ashley Merrick stated: "it was the decision of the hirer ups", "they've all decided", when stating the decision to terminate Plaintiffs employment.

**127.** Plaintiff describes on numerous occasions where "Defendants" deliberately excluded her from training, deliberately took disciplinary actions against her for same or similar activity of her peers.

**128.** Plaintiff did reapply for a similar position before her termination.

## A.  Statement of Material Facts

### 1.  Discrimination and Harassment because of Race

**129.** "Defendants" gave inconsistent reasons for Plaintiff's bad performance evaluations.

**130.** Plaintiff's positive performance reviews are inconsistent with "Defendants", negative performance review of unprofessionalism.

**131.** Plaintiff received negative performance reviews because of her race, and her race was the reason for "Defendants" making negative performance reviews.

**132.** "Defendants" did not evaluate Plaintiff the same as her peers regarding performance and termination.

**133.** "Defendants" wrongfully used disciplinary actions in not promoting and discharging Plaintiff.

## B.  Statement of Material Facts

### 2.  False Disciplinary Actions

134.   "Defendants" disciplined Plaintiff for opposing the treatment described herein.

135.   "Defendants" knew Plaintiff had good performance reviews, and above average performance in her position.

136.   "Defendants" knew Plaintiff had no attendance, and or corrective action issues when they terminated her for inability to perform her job duties.

137.   "Defendants" knew Plaintiff was an ideal candidate for the promotion promised to her based on her good performance review.

138.   If Plaintiff were not black the actions described herein would not have happened.

139.   "Defendants" reason for terminating Plaintiff is false.

## C.  Equal Employment Opportunity

140.   Sections 102 and 103 of the Civil Rights Act of 1991 amends Title VII to permit jury trials and compensatory and punitive damage awards in intentional discrimination cases. The Civil Rights Act of 1991 Title I-Federal Civil Rights Remedies: Damages in cases of Intentional Discrimination sec. 102 42 USC 1981 sec. 1977A. Damages in cases of intentional discrimination in employment 42 USC 1981a.

141.   The [EEOC] recognizes linguistic discrimination as national origin discrimination, and that "discrimination based on manner of speaking can be national origin discrimination" In re Rodriguez, 487 F.3d 1001, 1006-08 (6th Cir. 2007).

## D.  Statement of Material Facts

### 3.  ( Challenged Actions)

142.   Plaintiff brings her causes of action Discrimination and Retaliation

143.   Title VII "has prohibited employers from discriminating against their employees on any of seven specified criteria: race, color, national origin, … , are personal characteristics set forth in section 2000e-2". Discrimination based on any one of these five characteristics, often referred to as status-based discrimination.

144.   One category of wrongful employer conduct, the employee's opposition to employment discrimination, and the employee's submission of or support for a complaint that alleges employment discrimination are wrongs based on types of protected employee conduct. *University of Texas Southwestern Medical Center v. Nassar, 570 U.S.* 338, 347 (2013)

**145.**   "Defendants" intentionally deprived Plaintiff of her promotion by falsely creating performance issues, and disciplinary action to discharge her from her employment because she opposed their treatment.

**146.**   "Defendants" intentionally deprived Plaintiff of an equal employment opportunity, training because of her race.

**147.**   "Defendants intentionally deprived Plaintiff of an equal employment opportunity that is to be employed because of her race.

**148.**   "Defendants intentionally deprived Plaintiff of an equal employment opportunity related to the terms, and conditions of her employment by creating a hostile work environment, when they refused to train her, and by treating her unfavorably and different than similarly situated white employees.

**149.**   Plaintiff has described the unfavorable treatment throughout her complaint.

**150.**   Plaintiff has described the hostile work environment throughout her complaint.

**151.**   Plaintiff has described similarly situated white employees that were treated different than Plaintiff throughout her complaint.

**152.**   Plaintiff has described the adverse treatment complained of and or committed by "Defendants throughout her complaint.

**153.**   Plaintiff contends the adverse treatment is due to her race, and her opposing the "Defendants" discriminatory treatment.

**154.**   Plaintiff contends but for her race she would not have been subjected to the perceived intentional race discrimination from "Defendants".

**155.**   Plaintiff contends she has described the perceived discriminatory treatment of "Defendants".

**156.**   Plaintiff contends she has described the injury caused by "Defendants" negligence.

**157.**   "Defendants" showed prejudice towards Plaintiffs "language" and "how she speaks" in their corrective action.  The Court found in, In re Rodriguez, 487 F.3d 1001, 1006-08 (6th Cir. 2007) that an employee was not selected for promotion based on a manager's impression about the applicant's "language" and "how he speaks."

**158.**   "Comments that directly suggest the existence of bias; no inference is necessary" Brown v. East Mississippi Electric Power Ass'n, 989 F.2d 858 (5th Cir. 1993) See Okoye v. Univ. of Texas Hous. Health Sci. Ctr., 245 F.3d 507, 514 (5th Cir. 2001) (explaining that in disparate treatment cases involving employee misconduct and discipline, a "plaintiff must show that the employer gave preferential treatment to another employee under nearly identical circumstances; that is, that the misconduct

for which the plaintiff was discharged was nearly identical to that engaged in by other employees").

159.    Other white employees repeatedly had questions up to the last day of training. Plaintiff's co-workers in the same training class had questions throughout the training period including up until the last day of training, received support, and were instructed to continue to reach out for support after training with no incident and or corrective action, no belittlement, no discharge from employment, and thanked for doing a good job during training. Plaintiff would also like to reference the following statement as support for her adverse treatment contention.

160.    Plaintiff also would like to reference the following in support of Defendants intent, liability, intent to harm, negligence and to assert Defendant's knowledge that they intentionally denied Plaintiff the same opportunity to enhance her skills learned during training the same opportunity given to the other white employees in the training class.

A.    *Defendant Bruce Roepke* who is white, reached out to the chat for support on March 4, 2022 at least (7) seven times as noted in *Plaintiffs Exhibit 3*.

B.    *Defendant Josh Harvey* who is white, reached out to the chat for support on March 4, 2022 at least (11) eleven times as noted in *Plaintiffs Exhibit 3*.

C.    *Defendant Amy Allums* who is white, reached out to the chat for support on March 4, 2022 at least (13) thirteen times as noted in *Plaintiffs Exhibit 3*.

D.    *Defendant Stacey Taylor* who is white, reached out to the chat for support on March 4, 2022 at least (11) eleven times as noted in *Plaintiffs Exhibit 3*.

E.    *Defendant Martina Deshays* reached out to the chat for support on March 4, 2022 at least (5) five times as noted in *Plaintiffs Exhibit 3*.

F.    *Defendant Joshua Harstick* who is white, reached out to the chat for support on March 4, 2022 at least (2) two times as noted in *Plaintiffs Exhibit 3*.

G.    *Defendant Jennifer Harvey* who is white, reached out to the chat for support on March 4, 2022 at least (2) two times as noted in *Plaintiffs Exhibit 3*.

H.    *Defendant Whitney Critton* reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3*.

I.    *Defendant India Carroll* who is white, reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3*.

J.    *Defendant Takeesha Whitlock* reached out to the chat for support on March 4, 2022 at least (4) four times as noted in *Plaintiffs Exhibit 3*.

**K.** *Defendant Madison Houchin* who is white, reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3.*

**L.** *Defendant Kayla Schultz training lead* who is white, responded to *Defendant Bruce Roepke*, "Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests"

**M.** *Defendant Kayla Schultz training lead* in her response below to *Defendant Bruce Roepke* on March 7, 2022 when he stated he was "*getting overrun here. Help please!, I'm about 3 hours behind,* " stated, " *Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests, Also reach out to your manager and see if they can assist with the chat reuqests, letting them know you are getting bogged down with requests, I got Layota helping in the chat as well; Monday's can get crazy, hang in there we're getting you some help".* 🙂

**N.** [Yesterday 2:31 PM] Simon, Sarah (*training lead Defendant Sarah Simon responding to Defendant Bruce Roepke when he needed help.*)

**O.** Roepke, Bruce add me to your chat please

[Yesterday 2:46 PM] Roepke, Bruce (*Defendant Bruce Roepke asking for help with task to clear a tech for the next job*)

Gone one I'm trying to get a confirmation on and I have some questions on it.

[Yesterday 2:46 PM] Roepke, Bruce

got not gone

[Yesterday 3:17 PM] Roepke, Bruce

I'm getting overrun here. Help please!

like 1

[Yesterday 3:19 PM] Schultz, Kayla

Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests.

like 1

[Yesterday 3:19 PM] Schultz, Kayla

Also reach out to your manager and see if they can assist with the chat requests, letting them know you are getting bogged down with requests. (*training lead*

*Kayla Schultz instructing the on-the job training group to reach out to the Regional Support Managers for support once they are out of training)*

[Yesterday 3:20 PM] Roepke, Bruce

Yeah, I've put it in the chats. I'll add a mgr too, but mine is off today

[Yesterday 3:20 PM] Roepke, Bruce

I'm about 3 hours behind

[Yesterday 3:24 PM] Schultz, Kayla

I got Layota helping in the chat as well

[Yesterday 3:27 PM] Roepke, Bruce

Thanks. This has been intense.

[Yesterday 3:28 PM] Schultz, Kayla

Monday's can get crazy, hang in there we're getting you some help 

[Yesterday 3:28 PM] Schultz, Kayla

The techs also know that if they need confirmation they can call the fosc

[Yesterday 3:28 PM] Roepke, Bruce

I'll start on my EOD once I'm done with this confirmation and the phone call

[Yesterday 3:42 PM] Roepke, Bruce

Thanks for all the help.

heart 1

## 4. <u>Right of Recovery</u>

***P.*** (a) right of recovery

42 USC 2000 an employment discrimination claim against a recipient of Federal Financial assistance that otherwise might raise a Title VI issue must be brought

under *Title VII of the Civil Rights Act* of 1964, as amended, 42 USC sec 2000e., if a primary objective is not employment.

See *N. Haven Bd. Of Educ. v. Bell*, 456 U.S. 512, 530 (1982) the legislative history thus corroborates our reading of the statutory language and verifies the court of appeals conclusion that employment discrimination comes within the prohibition of Title IX. *Bentley v. Cleveland Cty. Bd. Of Comm'rs* 41 F.3d 600 (10th Cir. 1994) (Sec. 504 claim alleging discriminatory termination of former employee).

Courts also have held that Title VI adopts or follows the Fourteenth Amendment's standard of proof for intentional discrimination, see Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 412-18 (1978); and, generally, the Title VII standard of proof for disparate impact. See *Guardians Ass'n v. Civil Serv. Comm'n of City of New York*, 463 U.S. 582, 639 (1983); *Elston v. Talladega Cty. Bd. Of Educ.*, 997 F.2d 1394, 1405 n.11, 1407 n.14 (11th Cir. 1993)(see, infra, Section V, ch 1). Accordingly, cases under these constitutional and statutory provisions may shed light on the Title VI analysis in a given situation.

Finally, cases decided under Title VIII of the Civil Rights Act of 1968, the Fair Housing Act, 42 U.S.C. Sec. 3601 et seq., may also be instructive regarding the disparate impact analysis under Title VI.[viii]

The 1991 amendments added the legal remedies of compensatory and punitive damages and the right to trial by jury for those remedies. 42 U.S.C. Sec. 1981a(a)(1). Title VII plaintiffs now may recover injunctive and other equitable relief, compensatory and punitive damages, and attorney's fees. 42 U.S.C. Sec. 1981a(a)(1), 2000e-5(g)(1), (k). *The Civil Rights Act of 1991* amended Title VII.

## Due Process

Plaintiff contends this is a  due process issue because Texas is an employment at will state and an employer and/or employee can terminate employment at will.

### BACKGROUND FACTS

1.      Plaintiff was an employee for Defendant from January 2021 until  March 7, 2022.

2.      In January 2022 Plaintiff began training for a new position Regional Support Specialist in which she was qualified for the new position. (Exhibit 1)

3.      Plaintiff attempted to perform her job duties during training but Defendant refused to properly train Plaintiff consequently undermining the work Plaintiff did.

4.      Plaintiff was punished for note taking during training, asked to use the trainers notes instead, and punished for using leisure time to go over material pertaining to the job.

5.      Plaintiff attempted to fulfill her employment duties after complaints to Defendant about Defendant's refusal to move Plaintiff to another position after Defendant determined Plaintiff was unable to perform the duties of the new position. Defendant took no steps to prevent or rectify the behavior.

6.      Defendants refused to train Plaintiff demanding Plaintiff to "figure it out". (Exhibit 2)

7.      Plaintiff received reprimands for performance and behavior while in training resulting in termination. (Exhibit 3)

8.      Defendants in their corrective action published that Plaintiff "behavior impacted her performance to be on pace with her peers", "the mentor had to cover the workload…, "the other RSS install agent took on work from market 632/674", and in (Exhibit 8), a mentor says in the chat "usually when the chat is mixed you all just take the next one in line", meaning that we share in responsibilities.

9.      Plaintiff contends that it is clear and convincing as evidenced including but not limited to Defendants corrective action publication, chat communication of training activity of other similarly situated employees the Defendants acts and or omission was disparate, differential treatment with a disparate impact on Plaintiff' employment.

10.     Plaintiff contends that same or similarly situated employees had questions regarding job duties, job functions, and these same employees were not ostracized, and excluded from employment during training. (Exhibit 8 3.4.22, 3.7.22)

11.     In March 2022, Plaintiff asked to be transferred to a different position as an alternative to termination. (Exhibit 4)

12.     Plaintiff applied for multiple jobs Defendant posted, but Defendant refused to hire Plaintiff for those positions even though Plaintiff is qualified for those positions. (Exhibit 5)

13.     Defendants refused to allow Plaintiff to remain employed at any position.

14.     Because Defendant placed reprimands in Plaintiffs file, Plaintiff was not eligible for a different position or rehire.

15.     Plaintiffs working conditions were a hostile, retaliatory, discriminatory atmosphere.

16.     Defendants intentionally treated Plaintiff differently than her peers, who were younger, of a different race, and color than Plaintiff, male, and as implied by Defendant's actions and comments more subservient than Plaintiff. (Exhibit 4)

17.     Plaintiff contends it is the intent of Congress including but not limited to, through and by the Labor Code to assist individuals over the age of 40 years of age, with disabilities, persons of color, and female stable employment, comprehensive training, and protection of these laws.

18.     Plaintiff contends Defendant knew or should have known that Plaintiff is in a protected class and that their actions violated protection of this protected class by discriminating against Plaintiff due to her race, age, and sex.

19.     Defendant right to employment at will does not provide protection for discrimination based on race, age, sex, defamation, violation of an employee's right to freedom of speech, disparate treatment, disparate impact, wrongful termination, retaliation, and wrongful discharge.

20.     Defendants are the direct and or proximate cause of Plaintiffs injury, and but for Defendant's actions Plaintiff would not have suffered injury caused by Defendant.

## VII.

## Conditions precedent

21.     Plaintiff filed the attached Charge of Discrimination with the Equal Employment Opportunity Commission.

22.     The Charge was filed within 180 days after Plaintiff was terminated.

23.     More than 180 days have passed since the Charge was filed and an attached Notice of Right to Sue letter was issued.

24.     Plaintiff has timely exhausted all of her administrative remedies.

**I.***Cause of Action— Discrimination—Disparate Impact—TCHRA[9], 29 CFR 1607.11 Disparate Treatment [10]*

**II.***Plaintiff is a member of a protected class.*

**III.***Plaintiff applied for job.*

**IV.***Application was rejected.*

**V.***The position remained open after the rejection.*
Plaintiff incorporates each of the foregoing paragraphs.

25.     Plaintiff is a 54-year old female and the eldest person of color present at the time of the incidence.

---

[9] Texas Commission on Human Rights Act.

[10] 29 CFR 1607.11 Disparate Treatment

26.     Plaintiff has the qualifications for the job.

27.     Defendant's rejected Plaintiff despite her qualification.

28.     Defendants continued to hire and look for other applicants with Plaintiffs qualifications.

29.     Plaintiff is denied the same employment, training, promotion, opportunity, available to other employees or applicants.

30.     Defendant intentionally treated Plaintiff less favorable than other similarly situated individuals because of her race, age, and sex.

31.     Defendants knew or should have known that Plaintiff is in a protected class due to her race, age, and sex, and that persons of age could have disabilities due to their age, and are not required to disclose their disability.

32.     Defendants continued to hinder Plaintiffs training by refusing to allow Plaintiff to interact during training, such as ask questions, Plaintiff was reprimanded and retaliated against for taking notes during the training forcing Plaintiff to rely on the trainer's instruction alone at times.

33.     Plaintiff had to be persistent in order to make notes during the training by including the trainer in what notes were being taken by Plaintiff taking caution to not dissatisfy the trainer regarding the notes being taken. (Please see attached USB-Audio-20220224-Day4OJT).

34.     Plaintiff contends same and similarly situated employees received different treatment, and had same and or similar questions and concerns during training and were not terminated based on performance. (Exhibit 8)

35.     Plaintiff contends some questions and concerns other training class co-workers had during training, Plaintiff did not have due to her previous position as scheduler with same and similar duties.

36.     Plaintiff contends she did not have the same questions due to her repeated review of the job duty with the trainers and had resolved questions and concerns of the many functions regarding the particular job duty and this was due to the nature of the work requirement to work independently. (Exhibit 8)

37.     Plaintiff contends both her previous position and position she was terminated from have requirements to be able to work independently, and that she met the requirement for both positions as the previous position was support for the current position complained of, and support of Plaintiffs qualification for the position complained of.

38.     Plaintiff shadowed the role of Regional Support Specialist prior to applying for the role. Plaintiff contends Defendants knowing, intentionally, wrongfully terminated her position due to discrimination based on race, age, and sex and with intent to deprive her of a right to employment.

39.     Defendant's performance reason for their indifferent treatment to Plaintiff are discriminatory in nature. (Exhibit 8)

40.     Plaintiff contends it was not that she was not learning, but practicing what she had learned was the issue with any performance issues she may have had.

41.     Defendants wrote false disciplinary actions against Plaintiff. (Exhibit 3)

42.     Plaintiff would not have suffered injury but for Defendants intentional acts, and or omission and are the cause of Plaintiffs injury.

43.     Defendant's actions violated section 21.051 of the Texas Labor Code, TCHRA, 42 USC 1981, Title VII Civil Rights Act of 1964, and 29 USC § 623(c), and  Fair Employment Act.

**VI.** *Cause of Action—Disparate Impact—Disparate Treatment——— TCHRA, Title VII*[11]

44.     Plaintiff incorporates each of the foregoing paragraphs.

45.     Plaintiff is a female, over age 40, and person of color.

46.     Plaintiff accepted an offer of permanent employment.

Plaintiff suffered adverse action, treatment. Plaintiff was the only female, over age 40, person of color, a temporary employee in the group promoted to a permanent position and subsequently terminated during training.

47.     Defendants continued to hire and look for other applicants with Plaintiffs qualifications.

48.     Plaintiff while working was attentive, met performance metrics taking 60-120 calls per day, had great attendance, positive attitude, hard-working, invested, approachable, and a partner to the company.

49.     Plaintiff has the education and work experience to perform all of the related job tasks. Plaintiff began telephone sales/telemarketing in 1986 at 18 years of age, customer service in restaurant business in 1983 at 15 years of age, grocery business in 1984 at 16 years of age, first computer training school in 1987 at 18 years of age. (Exhibit 6)

50.     Plaintiff has computer training since 1987 in how to operate a computer and subsequent continued computer training since 1987 until present.

51.     Plaintiff has worked steadily in a call center environment since November 2017, where she had to perform same and similar job duties related to the position with Defendants.

---

[11] Title VII Civil Rights Act

52.    Plaintiff contends Defendants in their corrective action state Plaintiff's "behaviors impacted her performance to be on pace with the class".

53.    Plaintiff contends Defendant's in their right to terminate employment at will does not include their right to defame Plaintiff in their corrective action publication, that Plaintiff "step away to avoid reviews, that Plaintiff "has a habit logging back from payroll and saying nothing, after repeated calling she will unmute after a few minutes and say yes". (Exhibit 4)

54.    Plaintiff contends Defendants reason for terminating Plaintiff that she could not perform the job duties are a disputed material fact, and whether Defendant training manager Ashley Merrick whom terminated Plaintiff did or did not witness Plaintiffs behavior in which she was terminated for is a disputed fact which Plaintiff complains of.

55.    Defendant's employment practice of offering employment to employees of a less dominant personality for hire into an already management workforce with more dominant personalities for purposes of training and development to later communicate/impart essential, fundamentally intimidating, oppressive treatment has a disparate impact.

56.    Defendant's conspired to deprive Plaintiff of her due process, inalienable right to life, liberty, and the pursuit of happiness. Plaintiff contends civil conspiracy took place in that a combination of two or more persons for the purpose of injuring Plaintiff resulting in special damages.

57.    Plaintiff contends Defendants intentionally committed the unlawful act of conspiring to injure Plaintiff by terminating her, by making defamatory statements in their corrective action publication to make it look like their reason for terminating Plaintiff was lawful.

58.     Plaintiff contends that Defendants knowingly, intentionally, willfully, and maliciously knew that their corrective action publication is not a correct assessment of Plaintiffs abilities to perform her work duties.

59.     Plaintiff contends that Defendants knowingly, intentionally, willfully, and maliciously knew or should have known that their publication was false regarding Plaintiffs avoiding review, and directly and or indirectly stealing time.

60.     Plaintiff contends Defendants defamatory publication is not supported by Plaintiffs previous reviews just prior to her promotion to the RSS role, and is just cause to avoid summary judgment in favor of Defendants, and a material fact to be disputed avoiding summary judgment.

61.     Plaintiff contends Defendants knowingly, intentionally, willfully, and maliciously, conspired to terminate her for reason of causing her harm.

62.     Plaintiff contends discrimination is a pretext for Defendant's action.

63.     Plaintiff contends her age was used by Defendants as a pretext for discrimination in that she was unable to perform the job duties, due to her abilities as a person over the age of 40 years of age, and that all other training class employees of her same race were younger, not of the same color.

64.     Plaintiff contends her sex is a pretext for Plaintiffs discrimination, and that there are no female employees for Defendants of Plaintiffs same race, and age in the training class that was similarly treated, and or terminated during training.

65.     Plaintiff contends that Defendants used her race as a pretext for discrimination, in that all other training class employees were not of the same color as Plaintiff.

66.     Plaintiffs contends Defendants knowingly, intentionally, willfully, and maliciously made defamatory comments that were untrue to cause Plaintiff harm.

67.     Plaintiff contends Defendants knowingly, intentionally, willfully and maliciously committed more than one unlawful act while terminating Plaintiff.

68.     Plaintiff contends that civil conspiracy to terminate Plaintiff is different from Defendants defamation corrective action publications, different from Defendant's reason given for terminating Plaintiff as at will, different from wrongful termination, different from discrimination based on race, age, and sex, and that all of the above mentioned are causes of action in this civil claim.

69.     Defendants acts and or omissions proximately caused Plaintiff damages, and but for Defendant's acts and or omissions Plaintiff would not have suffered injury.

70.     Plaintiff position with Defendant was a work at home position, which prevented Plaintiff from the danger of traveling in busy traffic, road rage, wear and tear to Plaintiffs vehicle, prevented Plaintiff from the expense of fuel to travel to and from work, Plaintiff had to retain new employment, new training skills for new position had to be achieved. Plaintiff' work environment changed from work at home to an in-office call center environment, where there are new challenges of working in an in-office call center environment. The two are not comparable positions in relation to work environments, and compensation.

71.     Plaintiff was forced to accept a lower paying position.

72.     Plaintiff contends termination of her employment by Defendant is significant in that her earnings were substantially greater than any of her previous employment earnings

73.     Plaintiff made notes throughout her tenure which assisted her as well as colleagues to be more efficient.

74.     Plaintiff was often thanked by members of the sales team, technicians, service and install coordinators for her support, hard-work and diligence. (Exhibit 7).

75.     Plaintiff during her tenure frequently assisted colleagues with processes, both colleagues with more and less seniority than Plaintiff. (Exhibit 7).

76.     Defendant's arbitrarily and unreasonably required Plaintiff to perform work duties during a training period as those of an experienced employee working the same position per Defendants statement during recorded audio. (Exhibit 4)

77.     Defendant's expectations of the Plaintiff during training per the Defendants reason for termination were unreasonable as Defendants did not allow Plaintiff to work the position and was not the "best estimate of anticipated experience".

78.     Defendant's made mention of Plaintiff use of the word "Unfortunately" in the corrective action setting off the customer, Defendant's made use of the same word when terminating Plaintiff saying it was "Unfortunate".

79.     Defendants used unfortunate in one of the scripts provided to employees used to respond to customers.

80.     Defendants used double standards when evaluating Plaintiff performance during training, as Defendant's were including but not limited to unprofessional in their treatment of Plaintiff.

81.     Defendants state Plaintiffs employment is at will, and termination is a business necessity, Defendants "reason for its decision is unworthy of belief".

82.     "Defendants practice or policy in question has not demonstrated that terminating Plaintiff during training has a demonstrable relationship to the requirements of the job, the business necessity defense".

83.     Plaintiff contends Defendant have a duty to train and develop Plaintiff as an employee, and this requirement is not equivalent to at will employment, and is protected under due process, and anti-discrimination laws.

## VII. *Cause of Action—Age Discrimination——TCHRA[12]*

84.     Plaintiff incorporates each of the foregoing paragraphs.

85.     Plaintiff is a member of a protected class 40 years and older.

86.     Plaintiff is qualified for the position; Plaintiff worked a previous position for 12 months with similar duties while working for Defendants. Plaintiff suffered a final, adverse employment action.

87.     Plaintiff was replaced by someone younger.

88.     Plaintiff was treated less favorable than others who were similarly situated, including persons of color, persons of a different race, and persons under the age of 40 years that were part of the same training class as Plaintiff.

89.     Plaintiff was the only female, person of color, over age 40 that received corrective action and terminated during the training process.

90.     Defendants punished Plaintiff for exercising her right to employment training, right to take notes during training, right to be treated fairly, and that but for Defendants actions Plaintiff would have no injury.

91.     Defendants refused to provide necessary lawful indiscriminatory training for new position to Plaintiff.

92.     Plaintiff was the only female, over age 40, and person of color terminated during training.

---

[12] Texas Commission on Human Rights Act.

93.     Plaintiff has no recourse but Defendants Human Resource Department, who are responsible for the actions complained of in this complaint.

94.     Plaintiff would not have suffered injury but for Defendants intentional acts and or omissions.

95.     Defendant's actions including but not limited to violated section 21.051 of the Texas Labor Code, TCHRA, 42 USC 1981, Title VII Civil Rights Act of 1964, and 29 USC § 623(c).

## VIII. *Cause of Action—Hostile Work environment, Harassment, Retaliation Race Discrimination—TCHRA[13], [14] Title VII Civil Rights Act 1964, 42 USC 2000 (e), 14th Amendment, 18 USC 1001[15]*

96.     Plaintiff incorporates each of the foregoing paragraphs.

97.     Defendant discriminated against Plaintiff because of Plaintiff' race, age, and sex.

98.     Plaintiff is a female, over age 40, and a person of color.

99.     Defendants made written and verbal untrue statements that Plaintiff abandoned her employment while punched in to avoid performance reviews of her work. (Exhibit 3)

100.    Defendants "willfully" made a false statement with intent to deceive, a design to induce belief in the falsity, or to mislead.

101.    Defendants "made a conscious effort to avoid learning the truth, and is a material misrepresentation of the truth".[16]

102.    Defendants neglected to train Plaintiff telling Plaintiff to "figure it out" when questions arose during periods of training.

---

[13] Texas Commission on Human Rights Act.

[14] Title VII, 42USC 2000e, 42 USC 1981, 29 USC§ 623(c), 14th Amendment

[15] 18 USC § 1001

[16] United States v. Clearfield, 358 F. Supp. 564, 574

103.     Defendants knew or should have known their actions were discriminatory, intentional, and unlawful.

104.     Plaintiff would not have suffered injury but for Defendants acts and or omissions.

105.     Defendant's actions including but not limited to violated section 21.051 of the Texas Labor Code, TCHRA, 42 USC 1981, Title VII Civil Rights Act of 1964, 29 USC § 623(c), and 42 USC 2000(e) .

## IX. *Cause of Action—Wrongful Termination—Constructive Discharge Discrimination— TCHRA*

106.     Plaintiff incorporates each of the foregoing paragraphs.

107.     Defendant terminated Plaintiff's employment as a constructive discharge due to race, age, and sex.

108.     Defendants refused to offer Plaintiff fair training, and that Plaintiff, "figure it out", during training. (Exhibit 2)

109.     Plaintiff is not responsible for the training process, and has no recourse for the actions of Defendants during training, due to Defendant's not having a process to resolve issues during training such as one's complained of in this complaint.

110.     Plaintiff made inquiries to Defendants into options regarding the issues during training, and Defendant's did not offer any remedies. Plaintiff made audio recordings of the training staff actions towards her during training in support of adverse actions towards Plaintiff.

111.     Defendants intentionally labeled Plaintiff throughout the entire training period by isolating Plaintiff, refusing to allow Plaintiff to participate by not calling on Plaintiff with raised hands during question answer portions of the training.

112.     Defendants' expectations of the job performance during the training period were unreasonable.

113.    Plaintiff has the necessary experience and skills to perform the job tasks; Plaintiff performed similar job-related tasks for Defendant previously for over 12 months, yet Defendants discriminatorily picked the most desired employees in the training class, causing disparate impact towards Plaintiff.

114.    Plaintiff contends Defendants in their corrective action lists "no improvements between interactions with customers and technicians", "Sonya will often look past the support and continue to struggle with the task at hand", "Sonya insists to do it her way and does not apply the feedback given from the training team". Not being able to apply the feedback/coaching has hindered Sonya from improving with her performance".

115.    Plaintiff contends she worked with the same Technicians, same customers, same co-workers in the same department for the previous twelve (12) months without incident.

116.    Defendant's termination of Plaintiff is, "suspicious timing", in which Plaintiff contends Defendants intentionally denied Plaintiff employment for reasons other than Plaintiffs performance and conduct.

117.    Plaintiff contends she rightly so is qualified for the position, completed the first training, met the requirements of the training by not missing any days of training, being on time, successfully completed the training, and that the training for the position complained of, she met the same requirements, and Defendants wrongfully terminated her due to her performance, and behavior.

118.    Defendants in their corrective action dated 2/28/2022 published "Sonya Chapman has made tremendous improvements with her behavior, but she is still behind where she needs to be with the policies and procedures".

119.    Defendants reason for terminating Plaintiff is doubtful, untrustworthy, and misleading as Plaintiff worked in a position with similar duties, using the exact same applications for 12 months prior.

120.    Plaintiff contends there were approximately four new applications introduced in the new role that Plaintiff had not trained on, but are similar in practice and function to other applications previously used in previous position with Defendants.

121.    Plaintiff contends that discovery is needed to further material evidence complained of in this amended complaint.

122.    Plaintiff contends the new position was possibly an internal position that was not publicly offered at the time, but is now offered publicly all to discriminatorily deny Plaintiff employment saying the position is not offered publicly and that it is not available but internally.

123.    Plaintiff was not allowed the opportunity to even practice the newly introduced job duties in full. Plaintiff was only allowed to practice in part a portion of the newly introduced job duties will on the job training with a mentor.

124.    Plaintiff prior to applying for the position which she was terminated consulted with management as to whether they felt Plaintiff had the experience needed for the job and was told yes.

125.    Plaintiff then after training for a period of 4 months in preparation to apply for the Regional Support Specialist role then applied and was hired.

126.    Normal practice in customer service, support specialist roles is to allow the employee to build their new skills of the position by practice, trial and error. Plaintiff performance reviews were exceeded expectations and the new position was an extension of the same duties. Plaintiff went in to the new position with experience performing the same duties.

127.   Defendants' actions are subjective in nature, and violates Plaintiffs due process right to employment, life, liberty, and property. Defendants did not allow any due process regarding Plaintiffs termination.

128.   Plaintiff asked Plaintiff if there was an appeal process, and Defendants responded no, Plaintiff was not allowed a hearing and or any process to refute her termination.

129.   Defendants used Plaintiffs behavioral issues as the reason for terminating Plaintiff, coupled with the right to terminate Plaintiff at will, and business necessity.

130.   Defendants limited Plaintiffs ability to speak during training, to ask questions, limited Plaintiff opportunity to give feedback, and retaliated against Plaintiff when doing so by undermining Plaintiffs performance during training.

131.   Defendants wrote false disciplinary actions against Plaintiff during the last training period when Plaintiff has exceeded expectations performance reviews, and excellent attendance in her previous position.

132.   Defendants were hostile towards Plaintiff during both training periods 2021 and 2022, forcing Plaintiff to ask Defendants to go over what she lacked at the end of the remaining training days in March 2022, the training staff gave poor performance reviews without going over ways to improve.

133.   Defendants bullied Plaintiff throughout the entire training period while displaying mob like, discriminatory treatment.

134.   Defendants hostile work environment escalated and manifested by a series of harassing acts.

135.    Plaintiff is a minority female over age forty working in a position primarily assigned to younger employees statically.   https://www.zippia.com/customer-service-representative-jobs/demographics/;

136.    Plaintiff was subject to unwelcome harassment, the harassment was based on Plaintiffs race, age, and sex, the harassment was severe and pervasive so as to alter the conditions of Plaintiffs work environment by creating a hostile and abusive situation, there is a basis for employer liability.

137.    Defendant's actions including but not limited to violated section 21.051 of the Texas Labor Code; Title VII, TCHRA, 42 USC 1981, 29 USC § 623(c), 42 USC 2000(e), 14th Amendment[17]

### X. *Cause of Action—Unlawful Retaliation—TCHRA*

138.    Plaintiff incorporates each of the foregoing paragraphs.

139.    Plaintiff engaged in protected activity as set forth in Texas Labor Code section 21.055.

140.    In response, Defendant retaliated against Plaintiff and ultimately terminated Plaintiff's employment.

141.    Defendant's actions violated section 21.055 of the Texas Labor Code.

### G.    Cause of Action— Intentional Infliction of Emotional Distress

142.    Plaintiff incorporates each of the foregoing paragraphs.

143.    Defendant knowingly, intentionally, willfully, and maliciously repeatedly acted without regard to the outcome of their actions, and harm caused to Plaintiff.

144.    Defendants conduct was outrageous.

---

[17] Title VII; TCHRA, 42 USC 1981, Title VII Civil Rights Act of 1964. and 29 USC § 623(c), and 42 USC 2000(e), 14th Amendment.

145.    Defendants conduct is the cause of Plaintiffs severe emotional distress.

146.    Plaintiff is caused harm by Defendants acts and or omission of acts by being forced to work a different position by terminating her employment, causing more stress, and anxiety, forcing her to work part-time hours earning less in income.

147.    Plaintiff contends it takes time to build experience/seniority at a work position, and due to the stress and anxiety caused by Defendants actions she has difficulty obtaining experience/seniority at her new current position. Plaintiff contends she has to start over, building experience/seniority learning a new position, becoming thoroughly, everything Plaintiff is capable of, achieving maximum productivity with minimal wasted effort or expense i.e., 100 percent, is delayed to the extent she works less than full time hours and could possibly delay her achievement at her new position, thus causing further harm.

148.    Plaintiff contends she worked full-time hours in her position with Defendants and was dedicated to learning and performing well. Plaintiff contends she performed above what was expected of her regarding learning and performance. Plaintiff contends she was dedicated to learn more in her previous role with Defendants by consulting with team leads, colleagues, management, by taking notes, which better suited her for the position of Regional Support Specialist. (Exhibit Notes Compliment)

149.    Plaintiff contends to be efficient in her position as well as any position i.e., working in a well and organized competent way she must learn and know related tasks to best perform her duties, in which Plaintiff took many, many, notes and reached out to other colleagues for support as the scenarios were ever changing, and not all colleagues had the same skill level, also there were constant known and unknown changes to policy and procedures.

**XI.** *Cause of Action— Unfair Advantage, Absolute Advantage, Unfair Disadvantage, Breach of Contract*

150.    Plaintiff incorporates each of the foregoing paragraphs.

151.    Plaintiff has reasonable expectation of entering into a valid business, employer, employee relationship.

152.    The Defendants had knowledge of Plaintiffs expectancy by Plaintiff's acceptance of Defendant's offer of employment, and attending on the job training.

153.    Defendant intentionally, willfully, and knowingly interfered with Plaintiffs legitimate expectancy from ripening into a valid business, employer, employee relationship; and

154.    Caused damages to Plaintiff resulting from such interference.

155.    Defendants in their statement called Plaintiff a partner, and Defendants Code of Conduct call employees Team members, and states Defendant are "committed to equal employment opportunity and do our best work in an environment where all team members feel valued, included, and recognized". (Exhibit 4) (Exhibit 9)

156.    Defendants prevented Plaintiff from practicing what she learned during training by terminating her employment. Defendants allowed Plaintiff to work the previous position after training in which was a position with lower pay with a temporary contract of employment.

157.    Plaintiff contends that Defendants have an absolute advantage, unfair advantage to terminate Plaintiffs employment by employment at will, consequently interference with prospective economic advantage in employment relationship.

158.    Defendants unfair advantage, absolute advantage, competitive advantage includes but not limited to Defendants hiring and terminating Plaintiff at will, making false statements to defame Plaintiff when terminating her, Defendants advantage to compete in that it limited

Plaintiffs ability to remain employed as she was qualified and Defendants unfairly used their absolute advantage to terminate Plaintiff.

159.    Defendants were unjustly enriched and benefited from undue influence, including but not limited to absolute advantage, and unfair advantage.

160.    Plaintiff contends she had an expectation of continued employment.

161.    Defendants breached the contractual relationship by terminating Plaintiff during training.

162.    Defendants offered a contract of employment, Plaintiff accepted, Defendants included Plaintiff as a team member in the Code of Conduct, also by calling Plaintiff a partner in a conversation had with the training manager Ashley Merrick, and assuring Plaintiff if she met the requirements of the training class, being present, on time, no absences for the training, attentive, and graduating she would have employment.

163.    Plaintiff did graduate the training class.

164.    Plaintiff performed as contractually required.

165.    Defendants breached the contract by failing to tender /perform as required.

166.    Plaintiff suffered injury due to the breach. Plaintiff suffered loss of income, emotional distress, pain and suffering, damages caused to professional reputation, damages economic and non-economic.

## XII. *Cause of Action— Defamation, Libel and Slander*

167.    Plaintiff incorporates each of the foregoing paragraphs.

168.    Defendants made a publication of a false statement of fact to a third party

169.    The publication was defamatory concerning Plaintiff.

170.    Defendants are at fault.

171.    Defendants caused harm resulting in damages including but not limited to Plaintiff professional reputation.

172.    Plaintiff was terminated by final written on March 7, 2022.

173.    Defendant's made false statements of fact in their statements that Plaintiff stole time, abandoned her employment, was unprofessional at her employment to customers and fellow co-workers.

174.    Plaintiff made publication of Defendants false statements to the EEOC, and to this Court.

175.    Plaintiff suffered injury to her reputation, character, professional reference and background due to Defendants false statements.

176.    Defendants made oral and written false statements.

177.    Defendants' false statements prevented Plaintiff from applying for posted positions by Defendant.

IX.

Damages

178.    Plaintiff incorporates each of the foregoing paragraphs.

179.    Defendants' actions violated the TCHRA, which entitles Plaintiff to recover from Defendants back pay, front pay, compensatory damages, as well as pre-judgment and post-judgment interest.

180.    Because Defendants' actions were done with malice and/or reckless indifference to Plaintiff's state-protected rights, Plaintiff is entitled to recover from Defendants punitive damages. 42 USC 1981(a)[18]

181.    Plaintiff seeks all damages available to her under the TCHRA; Title VII, 42 USC 1981, Title VII Civil Rights Act of 1964, 29 USC § 623(c), 42 USC 2000(e), 14th Amendment[19] Pursuant to Texas Labor Code section 21.259, Plaintiff is entitled to recover a reasonable attorneys' fee from Defendants including reasonable expert fees; **provided, Plaintiff seeks a final judgment, exclusive of interest and costs.**

Plaintiff incorporates each of the foregoing paragraphs.

182.    Plaintiff requests the Court enter an order providing injunctive and declaratory relief including, but not limited to:

   a.    Prohibiting Defendant from engaging in unlawful discrimination;

   b.    Reporting to the Court on the manner of compliance with the terms of a final order issued by this Court;

   c.    Paying court costs;

   d.    A declaration that Defendant violated Plaintiff's rights under Chapter 21 of the Texas Labor Code, engaged in unlawful employment discrimination, and considered an illegal factor in terminating Plaintiff's employment; and

   e.    Any additional equitable relief as the Court deems proper.

183.    **Pprovided, the total relief awarded to Plaintiff, including but not limited to money damages, equitable relief, and attorney's fees, exclusive of interest and costs.**

---

[18] 42 USC 1981(a)

[19] Title VII; TCHRA, 42 USC 1981, Title VII Civil Rights Act of 1964. and 29 USC § 623(c), and 42 USC 2000(e), 14th Amendment.

184.    Plaintiff incorporates each of the foregoing paragraphs.

185.    Defendant is liable for the acts and/or omissions of their respective agents, representatives, employees, servants, and officers.

186.    Pursuant to Texas Rules of Civil Procedure 194, Plaintiff requests that Defendant disclose and produce to Plaintiff's counsel within 50 days of the service of this request, the information or material described in Rule 194.2.

187.    Plaintiff demands a trial by jury. Plaintiff respectfully requests that Defendant be cited to appear and answer, and that upon final trial of this matter, the Court enter judgment, **exclusive of interest and costs, when including all claims and causes of action, including equitable relief**, awarding Plaintiff:

    A.    Back pay and front pay (including benefits);

    B.    Compensatory damages;

    C.    Punitive damages;

    D.    Reasonable attorneys' fees and expert fees;

    E.    Injunctive and declaratory relief, including but not limited to, an Order:

        a.    Prohibiting Defendant from engaging in unlawful discrimination;

        b.    Reinstating Plaintiff's employment with Defendant with back pay;

        c.    Reporting to the Court on the manner of compliance with the terms of a final order issued by this Court;

        d.    Paying court costs;

        e.    A declaration that Defendant violated Plaintiff's rights under Chapter 21 of the Texas Labor Code, engaged in unlawful employment discrimination, and considered an illegal factor in terminating Plaintiff's employment; and

        f.    Any additional equitable relief the Court deems proper;

F.      Courts costs;

G.      Pre-judgment and post-judgment interest at the rate set by law; and

H.      All legal or equitable relief this Court deems proper.

**(a)**

**Plausibility Standard**

1.  Plaintiff contends she stated facts related to her claim of race discrimination as follows:

    i.   Plaintiff is African American race, a member of a protected class, qualified for the job, subject to adverse employment decision, and similarly situated individuals outside her protected class were treated more favorably.

    ii.  Plaintiff is a member of protected class. Plaintiff was discharged from her employment during on-the job training. Defendants reason for discharging Plaintiff was for unprofessional behavior and inability to perform her job duties.

    Defendants segregated, and or isolated Plaintiff a member of a protected group (race) from other employees during on-the job training. Plaintiff alleges Defendants refusal to communicate with Plaintiff during on-the job training to all intents and purposes refusing to communicate was intentional as Defendant Ashley Merrick stated, Plaintiff was the only employee that was of concern in regards to their actions, practice, and policy of discharging an employee during on-the job training.

    Plaintiff contends her protected class status namely her race African American and the fact Plaintiff was the only African American employee discharged during on-the job training for unprofessional behavior and inability to perform supports her contention that she is in a protected class.

    Plaintiff contends she was the only on-the job training employee that received corrective action during on-the job training from Defendants namely Ashley Merrick training supervisor.

    Plaintiff contends she is qualified for the job as she has the necessary skill and experience for the Regional Support Specialist role as she is a college graduate with more than 10 years in customer service including phone and in person customer service skills. Plaintiff contends she worked in the Field Operations Support Center (FOSC) as a scheduler for (12) twelve months prior to accepting the role of Regional Support Specialist.

    Plaintiff contends she scheduled technicians for jobs in her scheduling role performing the same tasks as the Regional Support Specialist such as using the technicians schedule to find available appointments using the skill level of technicians available, networking with Regional Support Specialist to find sooner appointments, and to move appointments when possible to schedule sooner service appointments for missed appointments and or sooner appointment time requests.

Plaintiff in her scheduling position took initiative to learn some of the duties of the Regional Support Specialist role to better facilitate her role as a scheduler as some appointments would be overbooked, under-booked meaning not scheduled at all and was a main complaint of customers.

Plaintiff contends by networking with the Regional Support Specialists prior to applying for the Regional Support Specialist role she was able to learn and practice some of the tasks of the role prior to training.

Plaintiff contends that it was imperative that she learn how to perform some of the Regional Support Specialist roles in her current role of scheduler as it helped the process of scheduling much easier to keep down customer complaints and to assist the technicians along the way of keeping the customer happy with their appointments being made and kept on time. Plaintiff did a good job as scheduler as she would take in approximately 70-120 calls per day during an 8- hour shift managing to get all of the customers scheduled for appointments and happy with their appointment times.

Plaintiff contends she would often work with the Regional Support Specialist because they were the department to go to for manager approval to put a customer as a priority on a technician's schedule including special requests when a customer was missed the previous day and upset that their appointment was missed, these calls would take at a minimum 5-10 minutes sometimes up to 20-30 minutes.

Plaintiff contends good customer service such as this is crucial when you have an upset customer that is threatening to take action due to the unfulfilled service appointments and displeased service from a technician and or product issues.

Plaintiff contends often times technicians would be on her line in error, as a scheduler we were required to transfer the technicians to the Regional Support Specialists, but that she would give the service numbers they needed and or transfer them to the correct department instead of transferring them to the Regional Support Specialist to have them transfer them again and or instruct them that they needed to contact a different department.

Plaintiff contends she learned the issues the technicians would be calling about and if it was not a confirmation, a technician work schedule time issue, Plaintiff would assist the technician most of the time. Plaintiff contends the technicians would give their thanks to Plaintiff for saving them time, giving them the correct information regarding the department they needed to be transferred to, and preventing them from being transferred to a Regional Support Specialist when it is a different department they needed.

Plaintiff contends the Regional Support Specialist thanked Plaintiff for assisting technicians in instances when they did not need a Regional Support Specialist and instead got the technician to the correct department. Plaintiff contends it all worked out well, and that team work makes the dream work, and that she did the same in

many other aspects of her role as scheduler with other departments such as the sales, and trouble shooting department. Plaintiff learned what departments the customer needed to be transferred to instead of transferring the customer to the incorrect department to later be transferred to a different department which happened a lot.

Plaintiff contends she had to make lots of notes to get the correct information and that it took her months to learn how to better assist the customer as well as her fellow co-workers all while performing her role as scheduler.

Plaintiff contends she requested her manager to do reviews of her handle time, her professionalism while on the line with customers and fellow co-workers including technicians from 3-6 months so that she would receive a high score on her performance reviews. Plaintiff contends she received high scores on her performance reviews at the end of her being mentored by her manager. Plaintiff rather not give her managers name for fear of retaliation against her former manager.

Plaintiff contends there were 1-2 weekly performance reviews called quality assurance reviews (QA) where the QA team would listen to Plaintiff on a call and grade the call, which the grading was strict. Plaintiff had to greet the customer appropriately, actively listen to the customer to address all their issues, be polite, show empathy, close the call appropriately ask if you can further help, if there is anything else you can do to help, deescalate the issues, handle the call within 4 minutes. Plaintiff contends she had a call intake of 70-120 calls consistently every day to keep up with her quota, including helping fellow co-workers and that she did all she could to keep her position with Defendants ADT LLC. Plaintiff contends her first week in her position of scheduler she had an intake of 30 plus calls consistently and each week she took more calls with greater experience and skill as she learned her role, including assisting in other aspects of her role with fellow co-workers, and with customer issues that were not part of her role as scheduler, such as sales, upgrades, trouble-shooting, parts requests, requests to speak to service supervisors.

Plaintiff contends she had to learn the different aspects of the sales department because one part of sales was for upgrades, one was for new customers, one department was for existing customers, one sales department did not take calls from customers, and Plaintiff had to through trial and error and from a list of complaints from customers that they had been transferred to the incorrect department, and from fellow co-workers that there were many different aspects of each department to learn the correct department depending on the customers issue.

Plaintiff contends it took a lot of hard work and dedication to Plaintiffs employment, position as a scheduler, and commitment to her employer Defendants ADT LLC and to the customer to satisfy many of the requirements for good customer service in her role as scheduler.

Plaintiff contends her level of professionalism as required by Defendants ADT LLC improved while being mentored by her manager, and her manager was familiar with

Plaintiffs work ethics and her manager did agree that Plaintiff had reached a level of work ethic and professionalism to apply for the Regional Support Specialist role. Plaintiff contends it is required that you get approval from your manager to apply for a different role after you have been in your current role for 6months to 12months.

Plaintiff contends she did not have corrective action issues in her role as scheduler in training or otherwise.

iii. Title VII covers all aspects of the employer employee relationship including but not limited to recruiting, interviewing, hiring, training, disciplining, promoting, making job assignments, providing benefits, and firing. Employers cannot make employment decision about workers based on the assumption or stereotypes that they might have about the worker's protected characteristics. Example: an employer cannot refuse to promote a female employee based on the supervisor's belief that women are not effective leaders.

**Question of Fact: Plaintiff asks the Court to determine if her aforementioned statement of facts are Facts or conclusions as follows:**

i.  Plaintiff a is member of a protected class.
ii.  Plaintiff is qualified for the Regional Support Specialist role.
iii.  Plaintiff was subject to adverse employment decisions made by Defendants including but not limited to refusing to communicate with Plaintiff during on-the job training by not responding to questions Plaintiff had about the job duties namely Defendants Phil (trainer) Samuel McLaughlin (trainer). Plaintiffs discharge from employment, Defendant writing corrective actions against Plaintiff. Plaintiff was subject to adverse employment decisions when Defendants made false statements when writing Plaintiff. corrective actions against Plao Was Plaintiff subject to adverse employment decisions made by Defendants including but not limited to Defendants writing corrective actions against Plaintiff using untrue statements, stating Plaintiff would *"log back from payroll and saying nothing"*. Was Plaintiff subject to adverse employment decisions by Defendants discharging Plaintiff for inability to perform her job duties according to Defendants corrective action statement, (*Please see attached Exhibit 2*) Plaintiff has *"difficulty applying what she learned during OJT, when guided through the steps she is not listening to the mentor, not able to repeat back to the customer what the mentor has previously spoken on, ... often can't perform RSS duties without continuous help from the training team, ... she still needs constant support and guidance to complete RSS tasks"*.

Did Defendants inconsistencies in providing training support to Plaintiff subject Plaintiff to an adverse employment decision during on-the job training when their reasoning for discharging Plaintiff for inability to perform her job duties as *"can't perform RSS duties without continuous help from the training team"* is inconsistent with the support given to other employees in the on-the job training class. (Please see attached Exhibit 3 and the below statements of Defendant Kayla Schultz).

Was Plaintiff subject to adverse employment decisions made by Defendants while answering all questions other on-the job training employees had regarding job duties and determining

Plaintiff as "*can't perform her job duties without continuous help from the training team".*
*(Please see attached Exhibit 3)*

Is the treatment other OJT employees received of not receiving a corrective action *"for needing constant support and guidance to complete RSS tasks, ... having difficulty applying what they learned"* adverse treatment towards Plaintiff as shown in *Plaintiffs Exhibit 3* where *Defendant April McGill* reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3.*

*Defendant Bruce Roepke* reached out to the chat for support on March 4, 2022 at least (7) seven times as noted in *Plaintiffs Exhibit 3.*

*Defendant Josh Harvey* reached out to the chat for support on March 4, 2022 at least (11) eleven times as noted in *Plaintiffs Exhibit 3.*

*Defendant Amy Allums* reached out to the chat for support on March 4, 2022 at least (13) thirteen times as noted in *Plaintiffs Exhibit 3.*

*Defendant Stacey Taylor* reached out to the chat for support on March 4, 2022 at least (11) eleven times as noted in *Plaintiffs Exhibit 3.*

*Defendant Martina Deshays* reached out to the chat for support on March 4, 2022 at least (5) five times as noted in *Plaintiffs Exhibit 3.*

*Defendant Joshua Harstick* reached out to the chat for support on March 4, 2022 at least (2) two times as noted in *Plaintiffs Exhibit 3.*

*Defendant Jennifer Harvey* reached out to the chat for support on March 4, 2022 at least (2) two  times as noted in *Plaintiffs Exhibit 3.*

*Defendant Whitney Critton* reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3.*

*Defendant India Carroll* reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3.*

*Defendant Takeesha Whitlock* reached out to the chat for support on March 4, 2022 at least (4) four times as noted in *Plaintiffs Exhibit 3.*

*Defendant Madison Houchin* reached out to the chat for support on March 4, 2022 at least (3) three times as noted in *Plaintiffs Exhibit 3.*


*Defendant Kayla Schultz training lead* responded to *Defendant Bruce Roepke*, "Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests".

*Defendant Kayla Schultz training lead* in her response below to *Defendant Bruce Roepke* on March 7, 2022 when he stated he was "*getting overrun here. Help please!, I'm about 3 hours behind,* " stated, " *Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests, Also reach out to your manager and see if they can assist with the chat reuqests, letting them know you are getting bogged down with requests, I got Layota helping in the chat as well; Monday's can get crazy, hang in there we're getting you some help".* 🙂

[Yesterday 2:31 PM] Simon, Sarah (*training lead Defendant Sarah Simon responding to Defendant Bruce Roepke when he needed help no corrective action detected*)

Roepke, Bruce add me to your chat please

[Yesterday 2:46 PM] Roepke, Bruce (*Defendant Bruce Roepke asking for help with task to clear a tech for the next job no corrective action detected)*

Gone one I'm trying to get a confirmation on and I have some questions on it.


[Yesterday 2:46 PM] Roepke, Bruce

got not gone


[Yesterday 3:17 PM] Roepke, Bruce

I'm getting overrun here. Help please!

like 1



[Yesterday 3:19 PM] Schultz, Kayla

Bruce reach out to the chat and let them know to contact the FOSC for confirmation requests.

like 1



[Yesterday 3:19 PM] Schultz, Kayla

Also reach out to your manager and see if they can assist with the chat reuqests, letting them know you are getting bogged down with requests.

[Yesterday 3:20 PM] Roepke, Bruce

Yeah, I've put it in the chats. I'll add a mgr too, but mine is off today

[Yesterday 3:20 PM] Roepke, Bruce

I'm about 3 hours behind

[Yesterday 3:24 PM] Schultz, Kayla

I got Layota helping in the chat as well

[Yesterday 3:27 PM] Roepke, Bruce

Thanks. This has been intense.

[Yesterday 3:28 PM] Schultz, Kayla

Monday's can get crazy, hang in there we're getting you some help 🙂

[Yesterday 3:28 PM] Schultz, Kayla

The techs also know that if they need confirmation they can call the fosc

[Yesterday 3:28 PM] Roepke, Bruce

I'll start on my EOD once I'm done with this confirmation and the phone call

[Yesterday 3:42 PM] Roepke, Bruce

Thanks for all the help.

heart 1

# I.
## **ARGUMENT**

Defendants Motion to Dismiss should not be granted because it is a dismissal on the pleadings and is premature as the Court has not decided on the merits of Plaintiffs petition. Plaintiff contends Defendants in their Motion to Dismiss argued Plaintiff's allegations are "utterly devoid of any facts that would entitle her to relief".

Plaintiff contends she is entitled to relief under Title VII of the Civil Rights Act of 1964 and all its related past history including but not limited to SEC. 2000e-2. [Section 703] stating:

(a)  Employer practices
It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

(d)  Training programs

It shall be an unlawful employment practice for any employer, labor organization, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs to discriminate against any individual because of his race, color, religion, sex, or national origin in admission to, or employment in, any program established to provide apprenticeship or other training.

#### **Certificate of Service**

Plaintiff according to Fed. R. Civ. P. 5 (b), certifies a true and exact copy of *Plaintiff's Second Amended Complaint* is served to Defendant's Attorney Brent Sedge via ECF.

Respectfully Submitted,

/s/ Sonya Chapman
1533 Honey Trl.
Glenn Heights, Texas 75154

---

[i] en.wikipedia.org/wiki/Prejudice

[ii] en.wikipedia.org/wiki/Prejudice

iii https://www.indeed.com/cmp/Adt-1/faq/if-you-were-in-charge-what-would-you-do-to-make-adt-a-better-place-to-work?quid=1c4v4

iv National Labor Relations Board-Administrative Judge Opinions 16-CA-144548 (N.L.R.B. Nov. 16, 2018)

v https://www.eeoc.gov/laws/guidance/cm-604-theories-discrimination

vi https://www.indeed.com/cmp/Adt-1/reviews/it-used-to-be-fun-20-years-ago-now?id=c0186ea42af64565

vii National Labor Relations Board-Administrative Judge Opinions 16-CA-144548 (N.L.R.B. Nov. 16, 2018)

viii https://www.ce9.uscourts.gov/jury-instructions/node/166